PRESENT: All the Justices

WESTERN REFINING YORKTOWN, INC.

                                                          OPINION BY
v. Record No. 151641                          JUSTICE STEPHEN R. McCULLOUGH
                                                        December 15, 2016
COUNTY OF YORK


FROM THE CIRCUIT COURT OF YORK COUNTY
AND THE CITY OF POQUOSON
John E. Clarkson, Judge Designate

      Western Refining Yorktown, Inc. ("Western") appeals from a judgment upholding the

valuation of a refinery's machinery and tools for purposes of levying the machinery and tools

tax. It (1) challenges the assessment methodology employed by the County of York; (2) argues

that the Commissioner of the Revenue improperly ignored the assessment provided by Western's

expert; (3) asserts that the circuit court erred in allowing the County to take inconsistent

positions relating to the highest and best use of the refinery in the course of successive litigations

involving the same property; (4) contends that the Commissioner erred in failing to consider that

the refinery was no longer in operation as of 2011, as well as evidence of the contemporaneous

arm's length sale of the refinery equipment at issue; and (5) argues that the circuit court erred in

upholding the assessment at issue merely upon a finding that the Commissioner had followed a

uniform assessment methodology where such methodology was proven not to yield fair market

value. For the reasons explained below, we affirm.

                                          BACKGROUND

      We review the evidence in the light most favorable to the prevailing party, in this

instance the County. *County of Mecklenburg v. Carter*, 248 Va. 522, 523, 449 S.E.2d 810, 811

(1994).

I.    THE YORKTOWN REFINERY

The refinery was completed in 1956.  Western acquired it in 2006.  The refinery is a large site, occupying approximately 658 acres.  Between 2006 and 2008, Western invested heavily to upgrade the refinery, making purchases of approximately $213.5 million in equipment.  Although some of these investments were made to comply with environmental mandates, others added to the refinery's profitability.

The refinery business is cyclical.  While refining margins were generally low during the 1990s, they recovered in 2000 and 2001.  Margins increased significantly from 2003 through part of 2007.  One expert called this period the "golden years of refining."  Beginning in late 2008, refining margins drastically declined, although they recovered slightly in 2010.  The refinery at issue operated at a loss in 2010.  Western idled the refinery in September 2010 and laid off the near totality of the workforce.  In March 2011, Western filed a 10-K statement with the Securities & Exchange Commission indicating to investors that its refining assets were worth $472 million, and that it planned to let the facility sit idle to wait out the poor economy.  Western indicated that it planned to restart activities no later than mid-2013.

Ultimately, operations never resumed and on December 29, 2011, Western sold the refinery to Plains Marketing LP for $180 million in cash.  Plains is not a refiner and had no plans to operate the site as a refinery.  Under the agreement, if Plains sold all or part of the refinery equipment, Western could receive part of the proceeds.  At the time of the sale, Western needed cash and had experienced a credit downgrade from S&P, a bond rating agency.  The evidence also indicates that Western could receive a valuable tax advantage from writing off the value of assets.

In January 2013, Plains contracted with Louisiana Chemical Equipment Company and Louisiana Chemical Dismantling Company ("Louisiana Chemical") to sell or scrap the refinery equipment. The agreement called for Louisiana Chemical to remove all of the equipment by the end of 2015. Louisiana Chemical sold some of the equipment, including columns, paraffin coolers, and heat exchangers, but it was not able to sell any of the major units. Had any of the major units sold, Plains would have received 65% of the sale, and Louisiana Chemical would have received 35%. Instead, most of the refinery equipment was sold as scrap.

II.    TAXING THE REFINERY'S MACHINERY AND TOOLS

The refinery is subject to the machinery and tools tax. For the tax year beginning January 1, 2010, the County assessed the value of the refinery's machinery and tools at $96,144,520 and on January 1, 2011, the County assessed the value at $99,102,285. Ann Thomas, the York County Commissioner of the Revenue, explained that the assessment increased for 2011 because Western purchased machinery and tools worth over $7.8 million in 2010 and disposed of only about $1.7 million worth.

Thomas has been Commissioner of the Revenue for 23 years. She worked in the commissioner's office prior to her election, and has worked a total of 42 years there. Thomas earned a master certification issued by the Weldon Cooper Center at the University of Virginia. To maintain this designation, she must attend training and conferences every year. Thomas also acknowledged that she does not have training or experience as a private appraiser and she has not worked in the oil and gas industry.

Thomas valued the refinery's machinery and tools using "a percentage . . . of original total capitalized cost excluding capitalized interest" as provided by Code § 58.1-3507(B). This method works as follows: She first obtains a long list of taxable machinery and tools from

3

Western.  This list shows property disposed of and property purchased and the capitalized cost of the property.  The equipment is assessed at a 25% flat rate of original cost.  Thomas then applies the tax rate to the assessed value.  In 2010, for example, the original cost for Western's machinery and tools as reported by Western was $385,620,378.  Multiplying this figure by 0.25 yields an assessed value of $96,405,405.  This new figure is then multiplied by the tax rate to generate a 2010 tax bill of $3,856,203.80.

The 25% of original cost figure remains static.  It does not vary until the equipment is disposed of, that is, the assessment does not decline as the item ages.  Thomas acknowledged that she did not commission any studies to support the 25% rate.  She also does not physically evaluate the physical condition of the equipment assessed.

Thomas concluded that over time this percentage equates to the fair market value of machinery and tools, although she acknowledged that new equipment is undervalued by this method.  She noted that a manufacturer will add or remove parts and maintain the equipment to certain standards, both for safety reasons and to meet environmental law requirements.  Thomas acknowledged that this legislatively approved method places more weight on uniformity than on fair market value, but she observed that a business has the option to challenge the assessment, and to provide evidence that the assessment overvalues its property.  She testified that the method of assessment she uses is consistent with the practice in other jurisdictions in that region of the Commonwealth.

Western filed tax returns for the refinery and its manufacturing machinery and tools for 2010 and 2011 and paid the assessed machinery and tools taxes in full.  In February 2011, Western filed to have the refinery and its manufacturing machinery and tools treated as "idle" for tax purposes under Code § 58.1-3507(D).  On February 25, 2011, Western informed the County

4

of this intent in a letter stating: "It is our understanding that effective 1-1-2012 (2012 tax year) that the idled machinery and tools at the refinery will be exempt and no taxes will be due." "Idle status" exempts manufacturing property from taxation; in order to qualify, the property must be out of use for the entire 12 months before with no intention of being used in the subject tax year. Code § 58.1-3507(D). For the year 2012, the now-idle refinery was entirely exempted from the machinery and tools tax, as provided by Code § 58.1-3507(D).

Also, Western appealed the 2010 and 2011 assessments on December 14, 2010 and May 19, 2011 respectively, as excessive, citing the September 2010 suspension of its operations and the struggling economy generally. Regarding the 2010 assessment, Western stated that "the 2010 value did not adequately account for the negative economic conditions," and that "[d]ocumentations would be forthcoming" to support its claim that the 2010 value was $75 million instead of $426,469,005. The appeal for tax year 2011 alleged the "2011 assessed value exceeds [FMV]. *See* appraisal to be submitted by June 16, 2011," because "Facility was shutdown 9-2010."

On July 15, 2011, Western submitted an appraisal to Thomas prepared by Michael J. Remsha, an expert with extensive experience in the oil industry. Thomas met with Western officials and asked for documents to support Remsha's appraisal. Thomas reviewed what she characterized as Western's "very comprehensive appraisal." To determine the accuracy of this assessment, she conducted research by looking at tax rulings, Attorney General opinions, land records, and opinions from this Court. Thomas reviewed the tax returns Western provided. Thomas verbally asked for documents that supported Western's appraisal, notably the separate appraisal of the real estate and the tanks. She found that the site was subject to credit line deeds of trust in the amounts of $800 million and $1.7 billion and asked for information to identify

5

what type of machinery and tools Western had put up as collateral. Thomas stated that this additional documentation was never provided.

Thereafter, in a written response, Thomas explained her reasons for adhering to the County's original assessments after consideration of Western's independent appraisal. First, Western had agreed after a protracted appeal process for the 2009 assessment that the assessment for 2009 was correct both as to the value and the method of assessment. Thomas concluded that she "could give no consideration to an adjustment in value" in part because Western "had just agreed to the assessed value as of 2009," which she arrived at using the same methodology as used for the 2010 and 2011 assessments. She also noted that as of January 1, 2010, the operative date for the 2010 assessment, the refinery was fully operational. She asserted that after reading statements Western made to its stockholders, she concluded that Western had no plans before spring 2011 to permanently shut down the refinery.

Additionally, Thomas disagreed with the methodology that Western's expert had employed and reached the conclusion that it was not a "bona fide appraisal." In a letter dated February 24, 2012, she described at length why she rejected Remsha's appraisal, writing that

> [a]t the beginning of this current appeal process, I plainly stated that I would not accept an appraisal that "backed into" the value of machinery and tools. That is, an appraisal which derived the values of the machinery and tools and the certified pollution control equipment by deducting assumed values of all other assets from an assumed total value of the Refinery. Nonetheless, that was the methodology employed by the referenced appraisal submitted in support of the Refinery's appeal.

III. COMPETING EXPERT APPRAISALS

Western proceeded to challenge the Commissioner's 2010 and 2011 assessments in the circuit court by filing a complaint for correction of erroneous assessments, pursuant to Code § 58.1-3984, in the circuit court. It again relied on Remsha's assessment. In that assessment,

6

Remsha employed three approaches: sales comparison, income, and cost. He then "correlated" each approach to reach a conclusion as to the worth of the machinery and tools. The sales comparison approach calls for an analysis and comparison of recent sales of comparable property. The income approach "measures market value as the present worth of monetary benefits anticipated to be derived in the future from ownership of the asset." Finally, the cost approach estimates the value of property based on the current cost of the asset, minus depreciation or reduced value "from physical deterioration, functional obsolescence, and economic obsolescence."

Remsha discounted the income approach as a "non[-]meaningful indicator of value" because the refinery was losing money. In the concluding portion of his report, Remsha assessed the total value of the site and then deducted the value of component parts, such as real estate and its improvements, tankage, pollution control assets, and what remained, he concluded, was the value of the machinery and tools. He assessed the value of the machinery and tools at approximately $16 million for January 1, 2011, and $25 million for January 1, 2010, which he later revised to $24 million and $32 million, respectively.

The County obtained and presented to the circuit court its own expert evaluation by Paul Hornsby, an experienced appraiser and consultant. He likewise employed the cost, income, and sales comparison approaches. He estimated that the machinery and tools at issue were worth about $215.4 million for January 1, 2010, and $198 million for January 1, 2011.

Hornsby opined that the sale of the refinery to Plains was not relevant for purposes of assessing the worth of the machinery and tools tax. He noted that Western needed cash and it sold the site to Plains for cash. Western's need for cash, Hornsby supposed, could have had a dampening effect on price. Furthermore, he testified that there can be tax advantages to writing

off the value of assets. Hornsby based his valuation, in part, on what Western stated in its state tax filings and in its 10-K statements filed with the Securities and Exchange Commission. In these filings, Western assessed the refinery at almost double Hornsby's valuation. Hornsby noted that in a 10-K report Western filed with the Securities and Exchange Commission at the end of 2009, and therefore germane to the January 1, 2010 appraisal date, Western told its shareholders that its assets at Yorktown had a carrying value of about $725 million. Western noted that these assets were "recoverable," that is, that they "could and would" continue operating the refinery. By March 2011, Western reported $472 million in refining assets. Hornsby testified that the values listed on the 10-Ks would be reasonably approximate to market value under these conditions, namely, when the owner finds that the value of the assets has been impaired and orders an analysis concerning their value. He also reasoned that these statements were consistent with what Western was claiming in its corporate tax returns in Virginia in 2009, 2010, and 2011. At that time, Western anticipated restarting refining activity no later than the middle of 2013.

Hornsby laid out the basis of his disagreement with Remsha's estimate. Hornsby agreed significantly with Remsha's estimated replacement cost of a new refinery and assessment of physical depreciation. He parted company, however, on Remsha's estimates of and deductions for obsolescence. According to Hornsby, Remsha calculated an 83% reduction from the machinery and tools' value when new based on obsolescence, which was "well above what the sales data indicates . . . is the proper deduction for obsolescence." He noted that an adjustment in depreciation of only 5% would yield a value of $146 million. Changing Remsha's deductions by a mere 2%, Hornsby further noted, would yield a value close to the County's assessment. Hornsby also disagreed with Remsha's "top down" method of beginning with valuation of the

entire refinery and deducting all other assets, leaving a net value for the machinery and tools that remained.

In earlier litigation concerning the value of the land, Hornsby issued an assessment report for the purpose of "estimat[ing] the fair market value of the fee simple interest" in the refinery. Consistent with settled law, Hornsby valued the real estate according to its highest and best use. *Shoosmith Bros. v. Cnty. of Chesterfield*, 268 Va. 241, 246, 601 S.E.2d 641, 644 (2004). Hornsby valued the fee simple interest at $163.9 million as of January 1, 2010 and $173.2 million as of January 1, 2011.  In this report, Hornsby noted that "[t]he highest and best use as improved was to shut down the refinery and modify the existing facilities for use as a stand-alone terminal."  He also stated that "[g]iven our conclusion that the highest and best use of the real property is operation as a stand-alone terminal, we have not appraised and have no opinions of any separate fair market value of the Refinery Process Units."

Later in the report, Hornsby wrote that in light of his conclusion that the highest and best use for the facility was as a stand-alone terminal, his analysis of the "improvements . . . focuses solely on the assets that were contributory to the highest and best use as a terminal on the effective date."  Hornsby cited to the Plains sale, but chiefly to explain why he reached a valuation of the real estate he believed should be used for a stand-alone terminal that was lower than the $180 million that Plains paid to use the site for that very purpose.  In this report, Hornsby expressed no view concerning what should be done with the refinery, whether it should be idled or sold.  The real estate litigation was settled by agreement of the parties.

After hearing testimony from the expert assessors and other witnesses, the trial court found that Commissioner Thomas had conducted her initial assessment thoroughly and in accord with Code § 58.1-3503.  The court found her assessments to be prima facie correct.  The court

9

rejected the testimony of Western's expert, faulting his methodology. Thus, Western did not carry its burden of proof to show that the property in question was valued at more than its fair market value. Accordingly, the court found in favor of the County.

ANALYSIS

On appeal, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the prevailing party at trial. *Nationwide Mut. Ins. Co. v. St. John*, 259 Va. 71, 76, 524 S.E.2d 649, 651 (2000). "A judgment should be reversed for insufficient evidence only if it is plainly wrong or without evidence to support it." *Edmonds v. Edmonds*, 290 Va. 10, 18, 772 S.E.2d 898, 903 (2015) (internal quotation marks omitted). In a bench trial such as this, the trial court determines the credibility of the witnesses' conflicting testimony and the weight of the evidence. *Wetlands Am. Trust, Inc., v. White Cloud Nine Ventures*, L.P., 291 Va. 153, 173-74, 782 S.E.2d 131, 143 (2016).

Article X, Sections 1 and 2 of the Constitution of Virginia provide that, unless specifically exempted within the provisions of the Constitution, all property shall be taxed at a uniform rate among classes, and that "[a]ll assessments of real estate and tangible personal property shall be at their fair market value, to be ascertained as prescribed by law."

Under Code § 58.1-3507(A), "Machinery and tools . . . used in . . . manufacturing . . . shall be listed and are hereby segregated as a class of tangible personal property separate from all other classes of property and shall be subject to local taxation only." Local officials impose and administer the machinery and tools tax. *See* Code § 58.1-3983.1. Under this tax, the commissioner of the revenue assesses the value of taxable machinery and tools on an annual basis as of January 1. Code § 58.1-3103.

10

I.  APPLYING THE STANDARD OF REVIEW AND THE PRESUMPTION OF CORRECTNESS, WE CONCLUDE THAT THE TRIAL COURT DID NOT ERR IN UPHOLDING THE ASSESSMENT.

       A.      The evidence fails to establish that the Commissioner overvalued the refinery's machinery and tools in 2010 and 2011.

Western argues in its first assignment of error that the trial court should have disallowed the County's practice of assessing all machinery and tools at a static 25% of original cost, regardless of age or value. According to Western, this method is not reasonably expected to determine fair market value.

The legislature has expressly – and twice – authorized the method employed by the County here, assessing machinery and tools based on a percentage of original cost. *See* Code §§ 58.1-3507(B), 58.1-3503(A)(17). This methodology has two principal benefits. First, as a general proposition, it benefits the taxpayers. As our cases bluntly recognize, this method commonly will result in property being significantly undervalued for purposes of taxation. *See Norfolk & W. Ry. Co. v. Commonwealth*, 211 Va. 692, 694-95, 179 S.E.2d 623, 625 (1971); *City of Richmond v. Commonwealth*, 188 Va. 600, 625, 50 S.E.2d 654, 666 (1948). In other words, taxpayers pay less, particularly when the equipment is new. Because businesses can be expected to maintain the equipment that forms the basis for the owners' livelihood, this method can provide a reasonable approximation of fair market value over time. In addition, this simple method helps Commissioners of the Revenue perform what would otherwise be a Herculean, if not impossible, task: assessing the value of thousands upon thousands of tools and pieces of machinery used in manufacturing. They must make this assessment every year, for a broad range of equipment and across a wide spectrum of industry. Finally, this method minimizes the transaction costs associated with other valuation methodologies, costs that would be borne initially by the localities but that would have to be passed on to taxpayers.

11

Valuation using a fixed percentage of original cost, however, is not the final word. A commissioner must "upon request take into account the condition of the property," which "includes, but is not limited to, technological obsolescence . . . ." Code § 58.1-3503(B). A commissioner *must* also consider "upon the written request of the taxpayer . . . any bona fide, independent appraisal presented by the taxpayer." Code § 58.1-3507(B). The commissioner can revise the assessment if she is persuaded that the machinery and tools were overvalued using the percentage of original cost method.

In addition, a taxpayer can challenge an incorrect assessment in court. *See* Code § 58.1-3984. In mounting such a challenge, "it is well settled that there is a presumption in favor of the correctness of a tax assessment and the burden is upon the property owner who questions it to show that the value fixed by the assessing authority is excessive." *Norfolk & W. Ry. Co.*, 211 Va. at 695, 179 S.E.2d at 626. *See* Code § 58.1-3984(A). "The effect of this presumption is that even if the assessor is unable to come forward with evidence to prove the correctness of the assessment this does not impeach it since the taxpayer has the burden of proving the assessment erroneous." *Norfolk & W. Ry. Co.*, 211 Va. at 695, 179 S.E.2d at 626; *see also Fruit Growers Express Co. v. City of Alexandria*, 216 Va. 602, 610, 221 S.E.2d 157, 162 (1976).

> We have said frequently that values are matters of opinion, to which no rule of thumb can be applied. Before the valuation fixed by [the government assessor] can be lowered by the court, the taxpayer must carry the burden of proving that the property in question is assessed at more than its fair market value . . . .

*Skyline Swannanoa, Inc. v. Nelson Cnty.*, 186 Va. 878, 885, 44 S.E.2d 437, 441 (1947).

A showing that an assessment was flawed is not sufficient by itself for judicial relief. "A taxpayer seeking relief from an allegedly erroneous assessment has the burden to show that the assessment exceeds fair market value." *County of Albemarle v. Keswick Club, L.P.*, 280 Va.

12

381, 388, 699 S.E.2d 491, 495 (2010).[1] *See also* Code § 58.1-3984(A) (burden of proof rests with the taxpayer to prove the invalidity of the assessment). Therefore, the dispositive question is whether the evidence, viewed in the light most favorable to the prevailing party, establishes that Western's machinery and tools were *overvalued* in the assessments of January 1, 2010 and 2011.

Western first argues that the County offered no evidence to support the Commissioner's methodology as one reasonably expected to determine fair market value. In fact, the Commissioner testified based on her four decades of experience that although the methodology does not initially reflect fair market value because it undervalues new equipment, it does tend to approximate fair market value over time in an industry like refining, in which the manufacturer can be expected to keep the equipment in good condition. In addition, in past litigation, Western

---

[1] *See also Board of Supervisors of Fairfax Cnty. v. HCA Health Servs. of Va., Inc.*, 260 Va. 317, 328-331, 535 S.E.2d 163, 169-70 (2000) (affirming the circuit court's finding that the assessment substantially exceeded the subject property's fair market value); *Board of Supervisors of Fairfax Cnty. v. Telecomms. Indus., Inc.*, 246 Va. 472, 477, 436 S.E.2d 442, 445 (1993) (upholding the circuit court's finding that the computers were assessed at greater than fair market value and that the disparity between the computers' fair market value and the assessed value constituted error); *Smith v. Board of Supervisors of Fairfax Cnty.*, 234 Va. 250, 254-59, 361 S.E.2d 351, 353-56 (1987) (invalidating an assessment after finding that it was based on flawed methodology and that it exceeded the fair market value of the property based on the only credible evidence on the record); *Nassif v. Board of Supervisors of Fairfax Cnty.*, 231 Va. 472, 485, 345 S.E.2d 520, 528 (1986) (invalidating an excessive assessment and reassessing the subject property at a lower value consistent with its fair market value based on the evidence on the record); *Arlington Cnty. Bd. v. Ginsberg*, 228 Va. 633, 640-41, 325 S.E.2d 348, 352 (1985) (affirming the circuit court's decision to reduce the assessment on the basis that the subject property was incorrectly assessed at more than its fair market value); *Board of Supervisors of Fairfax Cnty. v. Donatelli & Klein, Inc.*, 228 Va. 620, 625, 632, 325 S.E.2d 342, 344, 348 (1985) (affirming the trial court's reduction of assessments after concluding that its methodology in determining fair market value was sound); *First & Merchs. Nat'l Bank of Richmond v. County of Amherst*, 204 Va. 584, 588-89, 132 S.E.2d 721, 725 (1963) (finding that the assessment greatly exceeded the subject property's fair market value and the appellants were therefore entitled to a reduction and reimbursement); *Tuckahoe Woman's Club v. City of Richmond*, 199 Va. 734, 739-40, 101 S.E.2d 571, 575 (1958) (holding that the city's methodology of determining a property's assessment in disregard of the undisputed evidence of the property's fair market value constituted error).

itself agreed with the Commissioner that the method was an appropriate one and had yielded an appropriate assessment, and the Commissioner's methodology has been specifically approved by the General Assembly.

Western points to the fact that equipment will deteriorate over time and lose value. Indeed, the refinery was originally constructed in 1956. The evidence shows, however, that to run efficiently and to comply with regulatory mandates, a refiner can be expected to maintain its equipment by adding and removing parts. James L. Watson, an oil industry expert who assisted Hornsby with his appraisal, testified that "even though on paper these units look like . . . they're very old, they are being regularly renovated and updated." Hornsby and Remsha offered testimony to the same effect. The record amply supports the conclusion that the refinery equipment was regularly upgraded and maintained. For example, Western made purchases of $213.5 million in equipment between 2006 and 2008. The evidence, viewed in the light most favorable to the prevailing party, the County, does not establish that, in this case, the refinery equipment had deteriorated to the point that the County's assessment must be rejected as a matter of law for overvaluing the refinery because of its age.

Western's second point is that market conditions lowered the value of the refinery. Here, Western's argument has more force. The evidence unequivocally establishes that the refining industry was in a slump during the relevant time period. The County's own expert noted that the refinery had lost $60 million from mid-2009 through mid-2010. Western made the decision to "mothball" the facility in September 2010 and later decided to convert it to a non-refinery use.

But here again, even if the Commissioner erred in failing to consider changing market conditions, Western nevertheless failed to establish that the County *overvalued* the refinery for the tax years that began January 1, 2010 and January 1, 2011. In fact, in filings with the

14

Securities and Exchange Commission, Western valued the entire site at over $600 million in 2010. This higher valuation is also consistent with Western's state tax filings.

Further, the $180 million arm's length sale of the entire site to Plains in late December 2011 does not have the persuasive force that Western claims regarding the value of the machinery and tools on the dates they were assessed. First, the sale occurred almost a full year after the last tax assessment, when it would have been clearer that the industry was in a prolonged slump. Second, Western was short of cash. We have defined fair market value as the price a property will bring when offered for sale by one who desires, but is under no obligation to sell it, and is bought by one who has no immediate necessity to purchase it. *Tuckahoe Woman's Club v. City of Richmond*, 199 Va. 734, 737, 101 S.E.2d 571, 574 (1958). The trial court could have concluded on this evidence that Western's need for cash had a dampening effect on price. Third, the trial court also heard evidence that Western could gain a tax advantage from this sale. Finally, Plains is not a refiner, and had no use for the refinery equipment in order to operate the facility as a stand-alone terminal. Accordingly, it set about ridding itself of the machinery and tools for which it had no use.

It is also important to avoid the distorting effects of hindsight. It turns out that the economic slump initially affecting the refining industry in late 2008 has persisted since that time, with only a brief respite in 2010. That conclusion, however, was not obvious when the Commissioner made her assessments on January 1, 2010, and January 1, 2011. As mentioned previously, the refining business is cyclical. Western itself was telling its shareholders in 2010 and early 2011 that it might reopen the refinery in 2012 or 2013. Western's expert noted that margins had recovered slightly in 2010. Western did not abandon or scrap the refinery in 2010; instead it went to the trouble of idling it in order to be able to restart the facility when margins

15

improved. The fact that industry conditions did not rebound before Western needed to generate cash does not mean that the assessment was wrong at the time it was made.

Viewing the evidence in the light most favorable to the prevailing party, we conclude that there is evidence in the record to support a finding by the circuit court that Western did not prove that the Commissioner overvalued the refinery's machinery and tools in the January 1, 2010 and January 1, 2011 assessments. Because the burden of proof rested with Western, this failure of proof means that the assessment must stand.

B.      The Commissioner did not ignore the appraisal submitted by Western's expert.

In its second assignment of error, Western faults the trial court for upholding the Commissioner's decision to "wholly disregard" and to "ignore" the appraisal submitted by Western's expert. Code § 58.1-3507(B) requires the commissioner of revenue to consider "upon the written request of the taxpayer . . . any bona fide, independent appraisal presented by the taxpayer." Initially, it should be noted that the trial court did not issue a ruling upholding the Commissioner's decision to disregard Western's expert. Rather, the trial court heard the testimony itself and concluded that Western's expert's testimony was unpersuasive regarding the value of Western's machinery and tools on January 1, 2010 and 2011.

Further, Commissioner Thomas certainly did not "ignore" the Remsha appraisal. The record establishes that she reviewed the appraisal and conducted additional research to determine whether it was well founded. She ultimately rejected the methodology adopted by Western's appraiser, concluding it was not a "bona fide appraisal." She issued a detailed written explanation for why she rejected Remsha's appraisal. In particular, she found inappropriate Remsha's methodology of assessing the total site, then "backing out" the values of separate component parts like real estate to derive a remaining value for the machinery and tools.

16

Western responds that its expert employed three methods of assessment, the income approach, the sales comparison approach, and the cost approach. The income approach is not at issue, because Remsha concluded that it was not an appropriate method under the circumstances. Even if the Commissioner rejected the sales comparison approach, Western argues, the Commissioner was not at liberty to ignore the cost approach. Remsha, however, did not provide the Commissioner with a separate assessment relying on the cost approach. In the portion of his report that sets forth the cost approach, Remsha valued all the tangible assets, including the machinery and tools at $140 million for 2010 and $130 million for 2011. Remsha's assessment using the cost approach did contain an important caveat. Because the refinery had suspended operations, he stated that "the cost indicator of value must be reduced to reflect the cost to start back up." Remsha, however, did not know what it would cost to restart the refinery. On those facts, the Commissioner did not act arbitrarily in rejecting the cost approach because it would yield an unknown result due to the lack of information about the cost to restart the refinery and because it included the entirety of the tangible assets without separating out the machinery and tools.

Remsha's ultimate conclusion as to value of the machinery and tools relied on a blended approach. He consulted both the cost approach and the sales comparison approach to reach a conclusion as to fair market value. In the "Correlation and Conclusion" portion of his report, Remsha assessed the value of the assets by starting with an overall value and then he "backed out," i.e., deducted, the value of the land, the tankage, the pollution control assets, and the land improvements, buildings, and office furniture and equipment. If Commissioner Thomas did not

agree with this "backing out" methodology, she could properly reject Remsha's overall conclusion.[2]

Code § 58.1-3507(B) requires a commissioner to "consider" an independent appraisal. It does not require the commissioner to uncritically accept the appraisal. The record plainly establishes that the Commissioner gave careful consideration to the appraisal but rejected it.

C.      Code § 58.1-3503(B) does not compel a contrary conclusion.

Western's next line of attack is to fault the Commissioner's assessment under Code § 58.1-3503(B). It also seeks to analogize this case to *Board of Supervisors of Fairfax County v. Telecomms. Indus., Inc.*, 246 Va. 472, 436 S.E.2d 442 (1993). Western argues that the trial court erred under Code § 58.1-3503(B) in failing to consider the fact that the refinery was not in operation for 2011 in assessing fair market value. The refinery was idled in September 2010. By statute, a tax assessment was made on January 1, 2011. At that point, the refinery had been idled for three months.[3]

Consistent with the constitutional mandate of Article X, Section 2 that assessments must be made at "fair market value," Code § 58.1-3503(B) provides in relevant part that "[a] commissioner of revenue shall upon request take into account the condition of the property. The term 'condition of the property' includes, but is not limited to, technological obsolescence of property where technological obsolescence is an appropriate factor for valuing such property." In other words, the default standard of assessing property based on a percentage of original cost

---

[2] At trial, Hornsby criticized this approach, analogizing it to appraising an entire residential neighborhood and then deducting the value of all the other homes to arrive at a residual value for the one remaining home.

[3] The idling of the refinery in September 2010 would have no bearing on the tax assessment dated January 1, 2010, because that assessment predated the idling of the refinery.

18

must occasionally yield to a more fine-grained assessment when the percentage of original cost method fails as a proxy for fair market value. For Code § 58.1-3503(B) to come into play, however, the taxpayer must make this request. *See* Code § 58.1-3503(B) ("A commissioner of revenue shall *upon request* take into account the condition of the property.") (emphasis added). A conceptually similar provision is found in Code § 58.1-3507(B), which requires the commissioner to consider "*upon the written request of the taxpayer . . .* any bona fide, independent appraisal presented by the taxpayer." (Emphasis added.) Here, Western plainly asked Commissioner Thomas to take into account the condition of the property and market conditions. Under Code §§ 58.1-3503(B) and 58.1-3507(B), once Western made the request of the Commissioner, she was required to at least consider the condition of the property and the market conditions that would affect the value of the refinery's machinery and tools. To the extent that the Commissioner felt that she could not do so, she was mistaken.

Because it is relying upon Code § 58.1-3503(B), Western does not argue that the refinery was technologically obsolete. Instead, Western contends that the refinery is functionally or economically obsolete due to market conditions. We agree with Western's general proposition that market conditions can reduce the value of machinery and tools. The fact that for a portion of the year the refinery was idled due to adverse market conditions is a relevant consideration in assessing fair market value. Nevertheless, we conclude that there is evidence to support the circuit court's finding that Western did not carry its burden of proving that the refinery was overvalued in the Commissioner's January 1, 2010 or January 1, 2011 assessment.

Western relied on Remsha's appraisal to establish that the County assessed Western's machinery and tools above market value. There is evidence in the record to support the trial court's decision not to accept Remsha's appraisal. The trial court heard extensive testimony

19

concerning the flaws with his approach. Remsha reached his conclusion about the value of the machinery and tools by beginning with an overall value, and then deducting the value of everything else. Whatever value was left from the initial total, he ascribed to the machinery and tools. Remsha changed his assessment from $16 million for January 1, 2011, and $25 million for January 1, 2010, to $24 million and $32 million for those years, respectively, not because of any new revelations concerning the machinery and tools but because the values for other refinery components had changed.

Casting further doubt on the value of Remsha's assessment, Western itself told its shareholders through 10-K filings and the state through tax returns that the refinery was worth a great deal more than the Commissioner's assessment. When challenged on the accuracy of these numbers as a measure of fair market value, Hornsby explained that while book value does not always reflect actual value, when a business is required to reassess value, as Western was here, the reassessed value can be expected to roughly track the value stated in 10-K filings.

Western initially anticipated that the idling would be temporary. The fact that Western made a business decision to sell the refinery to a non-refiner due at least in part to its need for cash and to gain a tax advantage does not mean that the Commissioner overvalued the refinery in 2010 or 2011. As noted above, under longstanding precedent, if the party challenging the tax assessment fails to meet its burden of proof, the Commissioner's decision will stand. Here, Western did not establish that the County overvalued the refinery's machinery and tools.

*Telecommunications Industries*, cited by Western, does not compel a contrary result. In that case, the taxpayer had purchased two computer systems for over one million dollars. 246 Va. at 474, 436 S.E.2d at 443. The following year, the manufacturer of this equipment released enhanced models that made the older computers technologically obsolete and, therefore,

20

substantially reduced their fair market value. *Id.* at 474-75, 436 S.E.2d at 443. Unlike in this case, the trial court in *Telecommunications Industries* found that the taxpayer had met its burden of rebutting the presumption of correctness and that the County had assessed the computers in excess of fair market value. *Id.* at 475, 436 S.E.2d at 444. We sustained the trial court's decision, concluding that the evidence established that the County had overvalued the computers' fair market value. *Id.* at 477-78, 436 S.E.2d at 445-46. In the present case, however, the trial court found that the taxpayer had not met its burden of proving that the machinery and tools were overvalued. While we in no way retreat from our reasoning in *Telecommunications Industries*, that case affords no support to Western. Under the standard of review here, we conclude that we must sustain the judgment below.

The evidence before the trial court established a possible range of values for the refinery's machinery and tools. Remsha, Western's expert, initially assessed the refinery's machinery and tools at $16 million for January 1, 2011, and $25 million for January 1, 2010, which he later revised to $24 million and $32 million, respectively. Remsha, of course, challenged Hornsby's methodology. Hornsby, for his part, assessed the refinery's machinery and tools at approximately $215 million for 2010, and $198 million for 2011, citing, in addition to his sales comparison and replacement cost approaches, higher valuations of the refinery advanced by Western itself. Given the circumstances surrounding the refinery's sale to Plains, and avoiding the distorting effects of hindsight, we conclude that under the standard of review there was evidence to support a finding that Western did not establish that the County overvalued the refinery's machinery and tools in 2010 or 2011 when it placed a value of $96,144,520 for 2010 and $99,102,285 for 2011.

21

II.    THE COUNTY DID NOT ASSUME INCONSISTENT POSITIONS IN SUCCESSIVE LITIGATION.

Citing *Burch v. Grace Street Building Corp.*, 168 Va. 329, 340, 191 S.E. 672, 677 (1937), Western argues that the trial court erred in permitting the County to assume inconsistent positions with respect to the value of the refinery equipment and the sale of the site to Plains.

We have held that a party may not approbate and reprobate, that is, "occupy inconsistent positions" in the course of successive litigation. *Id.* "The doctrine protects a basic tenet of fair play: No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth." *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 310, 777 S.E.2d 848, 850 (2015). We must tread carefully in this area, however, because a "litigant-witness has the right to explain or clarify his testimony" and, in addition, we should be mindful not to invade the province of the fact finder, whose role it is to resolve "any inconsistencies and discrepancies." *TransiLift Equip., Ltd. v. Cunningham*, 234 Va. 84, 93, 360 S.E.2d 183, 188 (1987).

Western does not contend that the County assumed a position that was directly contradictory on the valuation of the machinery and tools. That is, it does not argue that the County placed a low value on the machinery and tools in the context of the real estate litigation, and turned around and placed a high value on the machinery and tools in the personal property tax litigation. In the real estate litigation, Hornsby had no occasion to value the machinery and tools. Hornsby expressly stated in his first valuation that he was valuing "the real property only" and that he did not "appraise[] and ha[d] no opinions of any separate fair market value of the Refinery Process Units."[4]

---

[4] There is nothing underhanded about Hornsby pointing to an alternate use for the site in the context of the real estate litigation. Under our precedent, he was *required* to value the real estate according to its highest and best use. *Shoosmith Bros.*, 268 Va. at 246, 601 S.E.2d at 644.

22

Western's argument is more subtle. It argues that the *implication* of the County's position that the highest and best use of the facility as a stand-alone terminal means that the machinery and tools are "of very dubious value on the secondary market, [that is,] salvage value, because stand-alone terminals do not refine oil, thereby rendering the refinery equipment superfluous and virtually worthless."

We have held that the approbate and reprobate doctrine is limited to circumstances when "the litigant being estopped actually made a previous affirmative, inconsistent representation to a court." *Wooten*, 290 Va. at 310, 777 S.E.2d at 850. Here, the County did not make affirmative, inconsistent representations. Even if the doctrine were to apply to the necessary implications of a party's earlier position in litigation, Western's argument is still unavailing. Given that the highest and best use for the site is as a stand-alone terminal, it does not inexorably follow that the only use for the machinery and tools in 2011 is to sell the refinery equipment as scrap.

First, the record supports the conclusion that the refinery could be mothballed, used as a stand-alone terminal, and returned to use as a refinery when market conditions improved. Simply because an industry finds itself in a slump and a factory idled does not mean that the equipment used in that industry must have "salvage" value only. [5] Many industries, from automobiles to airlines, are cyclical in nature and idle some of their equipment at various points. Western actually did mothball the refinery and convert the site to a stand-alone terminal in 2010.

---

He found, and the record supports, that the highest and best use for this site was as a stand-alone terminal.

[5] To illustrate, suppose that a used car lot occupies land in a rapidly gentrifying area. Should a real estate appraiser, who does not assess the value of the cars, conclude that the highest and best use for the land is to build high end condominiums, it does not follow that the used cars on the lot are worth little or nothing. Further, should a real estate developer purchase the land and sell the cars at a discount to a wholesaler, it does not necessarily follow that the fair market value of the cars is their value as scrap, or even that the wholesale price represents the fair market value of the cars.

Western told its shareholders that it anticipated resuming refining operations in 2012 or 2013, depending on how the business environment evolved. Western further stated at a conference in 2010 that the refining operations were "temporarily" suspended. In addition, the evidence was that the refinery business is cyclical and unpredictable. The refinery could be preserved and returned to use when economic conditions were more favorable. Tellingly, this was the testimony offered by Western's expert. Remsha stated that given the unpredictable nature of the industry,

> at this point I believe that the highest and best use of the refinery itself and, specifically, the machinery and tools, would be to keep the plant non[-]operating until the margins on the East Coast improve such that it can produce a profitable enterprise[] again. In the meantime, use it as a product terminal.

In the real estate litigation, Hornsby did not take a position about what should be done with the refinery. Nowhere did he state that it could not be mothballed. Therefore, his statement in subsequent litigation that the refinery should be idled until economic conditions justified restarting the refinery is not inconsistent with his prior assessment of the highest and best use of the real estate.

The second assumption behind Western's argument of an inconsistency in Hornsby's testimony is that the refinery equipment had to be sold *as scrap* once the site converted to a stand-alone terminal. Western argues that the "obvious implication of [Hornsby's opinion in the real estate litigation] is that the [machinery and tools] used in the refinery operation w[ere] now of salvage value only." In fact, however, the evidence at trial established that there is a worldwide market for used refinery equipment. Louisiana Chemical, which purchased the refinery equipment from Plains in 2013, was able to sell some of the equipment, such as columns, paraffin coolers, and heat exchangers to various companies. The fact that most of the

24

refinery equipment ended up selling as scrap in 2015 does not render Hornsby's report factually inconsistent concerning the value of the refinery's machinery and tools as of January 1, 2010 and 2011. Louisiana Chemical was contractually obligated to dismantle, abate, and remove all of the refinery assets from the property by the end of 2015. The market for refinery equipment does not appear to be particularly liquid to begin with, and since the refining industry was in a prolonged slump, it is not surprising that Louisiana Chemical did not find a market for all the refinery equipment in the limited time it had to dispose of it.

Western also argues that Hornsby and, therefore, the County, approbated and reprobated with respect to the sale of the refinery to Plains. In the real estate litigation, Hornsby simply made note of the sale of the refinery to Plains, but he did so to explain why he valued the real estate at approximately $164 million, that is, 16 million *less* than the $180 million that Plains paid for the site. Again, there is no inconsistency. Western reasons that the arms-length sale to Plains for $180 million, minus Hornsby's assessment of the real estate of about $163.7 million, must leave a maximum of approximately $16.4 million available for the machinery and tools. Of course, not even Western's expert embraced such facile math. Moreover, the record does not support this figure as the only or necessary conclusion to draw from the evidence and the testimony. Western found itself short of cash, and decided to sell a refinery site at a time when the entire refining industry was in a slump. A seller who must effectuate a prompt sale, and under particular conditions (cash only), will likely receive a lower price. The record also establishes that a loss on the sale of the refinery assets can be financially positive for tax reasons. Western stated that it would take a non-cash loss of $440 to 460 million on the sale. The fact finder could conclude that the $180 million that Plains paid for the refinery was a low price for the site. In addition, Plains is not a refiner; it had no use for the refinery equipment and it

25

decided to rid itself of the equipment. Another relevant consideration is that the sale to Plains took place nearly two years after the last assessment in question, when it had become clear that the industry slump was a prolonged one. In 2013, three years after the 2010 assessment, Plains contracted with Louisiana Chemical to be rid of the refinery equipment. In turn, Louisiana Chemical marketed the refinery equipment in a hostile business climate and on an expedited timetable. None of this establishes a fatal inconsistency in Hornsby's assessment or in the County's positions in successive litigation.

CONCLUSION

For the foregoing reasons, we will affirm the trial court's judgment.

*Affirmed.*

CHIEF JUSTICE LEMONS, concurring.

I concur in the judgment reached by the Court in the opinion authored by Justice McCullough. As Justice McCullough notes:

> Viewing the evidence in the light most favorable to the prevailing party, we conclude that there is evidence in the record to support a finding by the circuit court that Western did not prove that the Commissioner overvalued the refinery's machinery and tools in the January 1, 2010 and January 1, 2011 assessments. Because the burden of proof rested with Western, this failure of proof means that the assessment must stand.

JUSTICE McCLANAHAN, with whom JUSTICE MIMS and JUSTICE KELSEY join, dissenting.

The Commissioner exceeded her statutory authority under Code § 58.1-3503 by imposing arbitrary tax assessments upon Western's refinery machinery and tools. The statute does require that such tangible personal property be "valued by a means of a percentage or percentages of

26

original cost." Code § 58.1-3503(A)(17). But the method for establishing the percentage must "reasonably be expected to determine actual fair market value." Code § 58.1-3503(B). This statutory requirement is dictated by Article X, Section 2 of the Constitution of Virginia: "All assessments of real estate and tangible personal property shall be at their fair market value, to be determined as prescribed by law."

In violation of these constitutional and statutory provisions, the Commissioner arbitrarily picked 25 percent as a percentage of the original cost of Western's refinery machinery and tools to establish their purported fair market value for purposes of imposing the County's personal property tax. As the Commissioner admitted on cross-examination, she did not conduct any studies or receive the assistance of any consultants in picking this percentage, and she could cite no data in support of it. Rather, she simply contacted other "localities in [the] area," determined that they "use a flat percentage also," and then just came up with 25 percent "as something I [did] myself." In doing so, the Commissioner "'committed manifest error.'" *City of Richmond v. Jackson Ward Partners, L.P.*, 284 Va. 8, 18, 726 S.E.2d 279, 285 (2012) (quoting *TB Venture, LLC v. Arlington Cnty.*, 280 Va. 558, 563, 701 S.E.2d 791, 794 (2010)). As aptly stated on analogous facts by Judge Newman in *National Helicopter Corp. of America v. City of New York*, 137 F.3d 81, 92 (2nd Cir. 1998) (Newman, J., concurring in part and dissenting in part), "if decision-makers picked the percentage number by throwing a dart at a display of numbers 1 to 100, use of the particular number hit would be manifestly arbitrary." That is effectively what the Commissioner did here. It was therefore worse than "employ[ing] an improper methodology in arriving at a property's assessed value," which proves manifest error. *TB Venture, LLC*, 280 Va. at 563, 701 S.E.2d at 794. It amounted to employing no methodology at all.

The Commissioner has set the purported fair market value of all taxable machinery and tools in the County at the same fixed percentage of 25 percent of original cost for each and every tax year indefinitely into the future regardless of their age or condition. It is no more true, however, to declare that any and all taxable machinery and tools in the County are never worth any more or any less than 25 percent of their original cost, than it is to declare that such taxable machinery and tools are never worth their original cost (i.e., 100%), or that none of them will ever be worth only a salvage value (i.e., something closer to 1%). As the majority points out, the Commissioner admittedly "concluded that *over time* the percentage [of 25 percent] equates to fair market value of machinery and tools." *Ante* at 4 (emphasis added). This rationale for justifying the Commissioner's taxing scheme unfortunately exemplifies the familiar adage that even a broken clock is right twice a day. Yet there is no evidence to support 25 percent, as opposed to 15 percent or 35 percent or any other percentage, as the actual fair market value "over time," or at any time.

To be sure, I fully recognize that it is much easier for the Commissioner to administer the tax on machinery and tools by using one fixed percentage of original cost for calculating their tax assessed value year in and year out. Here, however, ease of administration does not equate with constitutional and statutory compliance.[1]

In rendering his decision in favor of the County in the present case, the trial court judge explained that the Commissioner "looked at . . . 25 percent of the original cost [of Western's machinery and tools for their assessed value], and I believe that is the way that the Virginia Code

---

[1] Unlike York County, most of Virginia's localities determine the percentage of the original cost of machinery and tools that will be taxed by applying various sliding scales based on the age of the machinery and tools, with the percentage decreasing incrementally over time. *See* Stephen C. Kulp, Weldon Cooper Ctr. for Pub. Serv., Virginia Local Tax Rates (2015) § 10, at 161-77 & tbl. 10.1 (34d ed. 2016).

specifies it should be."[2]  The trial judge thus erred as a matter of law in approving this manifestly arbitrary taxing scheme, as it could not "reasonably be expected to determine actual fair market value."  Code § 58.1-3503(B).  It is also evident that the trial judge relied on little else.  "I think that there's no question, and I so find," the trial judge stated, "that the [C]ounty followed the statutory procedure for assessing the property."  He then declared, "I also find that there was no evidence that contradicted that."  This finding was plainly erroneous.  It reveals that the trial judge did not properly consider any of the testimony of the three expert witnesses that testified in this case on the issue of fair market value.  More specifically, none of the expert witnesses opined that the fair market value of Western's machinery and tools equaled 25 percent of their original cost in either of the two tax years in dispute.

Furthermore, the trial court, in upholding this taxing scheme, gave the County the benefit of the presumption that its tax assessments were correct.  *See TB Venture, LLC*, 280 Va. at 563, 701 S.E.2d at 794.  The County was not entitled to this presumption, however, because it "committed manifest error" by implementing this unlawful taxing scheme.  *Id*. (explaining that "[t]o rebut the presumption of correctness, 'a taxpayer must show by a clear preponderance of the evidence that the taxing authority committed manifest error'" (quoting *West Creek Assocs., LLC v. County of Goochland*, 276 Va. 393, 409, 665 S.E.2d 834, 843 (2008))).

In the absence of a proper review and sufficiently supported findings by the trial court upon the critical evidence presented by both parties on the central issue of fair market value, the majority has effectively assumed the role of fact-finder in parsing the evidence and affirming the trial court's decision to uphold the County's personal property tax on Western's refinery

---

[2] The trial court judge "incorporated fully" into the final order all of his findings and rulings announced orally from the bench at the conclusion of the trial.

29

machinery and tools.  But "[a]ppellate courts are not fact-finders."  *Cost v. Commonwealth*, 275 Va. 246, 256, 657 S.E.2d 505, 510 (2008) (Lemons, J., dissenting).  "It is a basic tenet of our legal system that, although appellate courts often review facts found by a judge or jury to ensure that they are not clearly erroneous, they do not make such findings in the first instance." *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 56 F.3d 556, 575-76 (4th Cir. 1995) (quoting *Maine v. Taylor*, 477 U.S. 131, 144-45 (1986)).  In doing so, the majority also compounds its error by giving the County the benefit of the presumption that its tax assessments were correct.[3]  *Ante* at 11-16.

Consequently, in light of the trial court's rulings on the record before us, I would reverse its judgment and remand this case for reconsideration, directing the trial court to conduct a full and fair review of all of the relevant evidence presented by both the County and Western concerning the fair market value of Western's refinery machinery and tools for tax years 2010

---

[3] In addition, the majority's reliance upon *Norfolk & Western Railway Co. v. Commonwealth*, 211 Va. 692, 694-95, 179 S.E.2d 623, 625 (1971), and *City of Richmond v. Commonwealth*, 188 Va. 600, 625, 50 S.E.2d 654, 666 (1948), in support of the Commissioner's arbitrary tax assessments is misplaced.  In neither case was the fair market value of the subject properties established by using a static percentage of the properties' original cost, as the Commissioner did here.  Indeed, in *City of Richmond*, the fair market value of the properties was not even in dispute.  The City was instead challenging the State Corporation Commission's decision to assess the properties for local taxation by application of a *percentage of their actual fair market value*.  *City of Richmond*, 188 Va. at 623-25, 50 S.E.2d at 665-66.  The Commission's utilization of that percentage ("an equalizing factor of forty per cent") for its assessment therefore had nothing to do with the Commission's threshold determination of the properties' actual fair market value.  *Id*. at 603, 50 S.E.2d at 655.  Then in *Norfolk & Western Railway Co.*, the dispute was an accounting principles battle to determine the proper methodology for establishing the fair market value of the railroad's property being assessed for local taxation, which resulted in this Court affirming the Commission's use of the "original cost less depreciation method."  211 Va. at 700-01, 179 S.E.2d at 629.  Thus, contrary to assertions by the majority, neither *City of Richmond* nor *Norfolk & Western Railway Co.* provides legal support for a purported "method" of taxation based on fair market value that would, as here, only "provide a reasonable approximation of fair market value *over time*."  *Ante* at 11 (emphasis added).

30

and 2011, as dictated by Article X, Section 2 of the Constitution of Virginia and Code § 58.1-3503(B).  *See Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982) ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings.").  In addition, because the County's challenged taxing scheme was unlawful, I would direct the trial court to conduct its review without giving the County the benefit of a presumption that the two tax assessments at issue were correct.

For these reasons, I respectfully dissent.