Present: All the Justices

McKEE FOODS CORPORATION

v. Record No. 180521

COUNTY OF AUGUSTA

OPINION BY
CHIEF JUSTICE DONALD W. LEMONS
JULY 18, 2019

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
James V. Lane, Judge

In this appeal, we consider whether the Circuit Court of August County ("circuit court") erred when it upheld the County's tax assessments against McKee Foods Corporation ("McKee") for the years 2011 through 2014.

## I. Facts and Proceedings

McKee owns real property located at 272 Patton Farm Road, in Augusta County (the "Property"). The Property consists of an 828,619 square foot industrial building on 171.54 acres and is where McKee manufactures, among other things, "Little Debbie" snacks. The County assessed McKee's property at $28,525,300 for the 2011, 2012, and 2013 tax years, and at $31,745,800 for the 2104 tax year. McKee filed an Application for Relief from Erroneous Assessments for Real Property Taxes in the circuit court, alleging that these assessments were above the Property's fair market value, were not uniform in application, and were otherwise invalid or illegal. McKee asserted that it was entitled to a refund of excess taxes paid on the assessments, as well as interest on the excess amounts paid to the County.

The County filed an answer and denied that the assessments were above fair market value, manifestly erroneous, not uniform in application, or otherwise invalid or illegal. A four-day bench trial was held in December 2017.

The evidence presented at trial demonstrated that the County hired Blue Ridge Mass Appraisal Company, LLC ("Blue Ridge") to appraise real property for the County for its five-year reassessment cycle of 2009-2013.  David Hickey ("Hickey") was the Blue Ridge employee who conducted the assessment of McKee's property for that time frame.  Hickey classified the Property as industrial use property with an appraised value of $31,741,200.  McKee appealed that assessment to the County's Board of Assessors, which reduced the assessment to $28,525,300.  McKee then appealed to the County's Board of Equalization, which affirmed the reduced assessment.  The County assessed taxes for 2011-2013 based upon that reduced figure.

The County hired a different company, Wingate Appraisal Service ("Wingate"), to appraise real property for the five-year reassessment cycle beginning in 2014.  Donald Thomas ("Thomas") was the Wingate employee who conducted the assessment of the Property.  Thomas classified the Property as a special use property, with an assessed value of $31,745,800.  The County did not use a Board of Assessors for the 2014 general reassessment, so McKee appealed that assessment directly to the County's Board of Equalization.  The Board of Equalization affirmed the assessment without modification.  The County then assessed taxes for 2014 based upon the assessed value of $31,745,800.

**McKee's Evidence**

Micheline Parkey, the corporate risk manager for McKee, testified that the company carried insurance on the property for the years in question.  The insurance covered the real property and personal property, and was a policy for replacement cost, not the amount that McKee thought it could sell the property.  The amount of coverage ranged from $136,944,380 to $139,944,380, depending upon the year.

At trial, McKee introduced David Hickey's deposition transcript, because Hickey was ill and unable to testify in person. In describing how he determined the assessment amount for the Property, Hickey testified that he used a cost method[1] to appraise the property, and then he referred to a list of 52 industrial sales he had previously accumulated to see if he was in the correct range of price per square foot. The properties on this list ranged in size from 28,360 square feet to 714,278 square feet, and all but two of the buildings were less than half the square footage of the Property. Hickey explained that he would calculate a certain price per square foot, and then compare it to the list of industrial properties to see if it was in the range of sales on the list. He would then make adjustments so that "the bottom line conforms with what those market sales indicated."

Hickey testified that his approach to valuation established "the range of the unit price per square foot [he] should be working towards." Hickey then used that average when he entered information about the Property into the Computer Assisted Mass Reappraisal system ("CAMRA"), a database management system utilized by Blue Ridge to process the valuation data for real estate. When asked "[w]hat appraisal methodologies does the CAMRA system include," Hickey responded that the CAMRA valuation model is very similar to a model that goes "back in the '70s." Although he had initially described his appraisal method as a cost approach, he later testified that the CAMRA is:

> not really a cost approach. We come up with -- how do I want to say it? We analyze the sales to come up with rates – unit rates that are applicable to the different types of properties because what we're -- what we're trying to do is come up with a set of rates so that, when we apply those rates against the information related to the known sales, that the value that comes out related to that --

---

[1] The witnesses refer to both the cost "method" and cost "approach" for valuation. Our prior cases also refer interchangeably to valuation "methods" and "approaches." Therefore, the words "method" and "approach" are also used interchangeably throughout this opinion.

3

those – that inventory of -- pieces of those particular properties,
that the value comes out close to what a property actually sold for.

According to Hickey, the CAMRA system's analysis needed to be "massaged" to reduce the valuation of the Property to "roughly" the raw average he derived from his list of sales. Hickey then admitted that the default physical depreciation for the Property, based on its age and condition, would have been only 9%. However, in order to achieve the result he thought was reasonable, Hickey adjusted the physical depreciation value to 45%.

Hickey testified that he made no adjustments to the sale prices of the properties on the list to account for the size of the properties, the location of the properties, or when in the ten-year period the sales occurred. Hickey further stated that he made no attempt to ascertain the nature of the sales (i.e., whether they were arm's length transactions) when he compiled his list. Hickey admitted that he assessed the Property using an average of the sale price divided by the square footage for each of the 52 properties on the list.

McKee then presented testimony from Thomas, who performed the 2014 assessment for the County while he was employed by Wingate. Through Thomas, McKee introduced Wingate's proposal to the County for the 2014 reassessment cycle. The proposal indicated that Miles Willett, a certified general real estate appraiser, would be conducting the appraisals. Instead of Willett, however, Thomas was the Wingate employee who assessed the Property. When Thomas assessed the Property, he was only a licensed residential real estate appraiser. Thomas did not obtain his certified general real estate appraiser license until 2015. Willett did not provide Thomas with any supervision or guidance for the McKee appraisal.

Thomas testified that he classified the Property as a special use property solely because it was originally designed and constructed to be used for food processing. He admitted, however, that the main building on the property was a rectangular-shaped industrial building and that it

4

could have been converted to a different use. Thomas testified that his appraisal of the Property was the price he thought it could sell for if McKee sold the Property to a buyer who also intended to use the Property as a food processing plant. Thomas used the cost approach to determine the value of the property. He testified that he was unable to use the comparable sales approach due to the lack of comparable sales for special purpose food processing plants, and he rejected the income approach due to a lack of rental market data because the Property was owner-occupied. Although Thomas testified that the market for the McKee Property was national in scope, he admitted that he did not search for rental data outside of Augusta County, and he did not search for comparable sales outside of the eastern region of the United States.

In his assessment report to the County, Thomas stated that "the assessment is compliant with USPAP Standard 6 (Mass Appraisal, Development and Reporting), including development of scope of work and highest and best use analysis." However, at trial Thomas admitted that he did not comply with Standard 6-8. Thomas claimed he was exempt from Standard 6-8 because he performed his appraisal for the County, and there is an exemption from certain USPAP standards for federal, state or local employees performing their official capacity. However, he admitted that he was not an employee of the County when he performed the assessment, so that exemption would not apply to his assessment.

McKee then called John Lifflander, an industrial and commercial appraiser, to testify as an expert witness regarding complex industrial appraisals. Among other qualifications, Lifflander authored the text book, "Fundamentals of Industrial Valuation," which was published by the International Association of Assessing Officers and serves as the authoritative text for that organization. Lifflander testified that he agreed to take on this case because, when he reviewed the numbers, he immediately knew the Property had been "overassessed." He explained that it

5

was a "jumbo building," and because it was over 800,000 square feet, it would be difficult to sell or lease. Also, he was already familiar with the price per square foot nationally for these types of properties and knew that the average price per square foot was half of the amount for which the Property had been assessed.

Lifflander described numerous problems with Thomas' assessment. First, Lifflander testified that the McKee property was a rectangular building, "and a rectangular building can be used for a lot of different manufacturing uses." Therefore, according to Lifflander, "if somebody says the highest and best use is food manufacturing, that shows they do not understand industrial buildings." Lifflander testified that another problem with Thomas' assessment was that he used the cost approach instead of the sales approach, and when he determined the depreciation he did not have any local market research to support that amount. Lifflander explained, "[t]here's no way they could know the value from the cost approach. There's no way you can depend on that value because it has to be corroborated with market evidence because depreciation is market driven." Lifflander also testified that Thomas' assessment did not comply with USPAP Standard 6 and pointed out several ways in which the assessment failed to comply with this Standard, including "the failure to apply an estimate of functional and/or economic obsolescence," the fact that "the sales comparison approach was also left out," and that "much of the information required by USPAP Standard 6 was missing from the information that Wingate provided from its work file."

Lifflander further testified that USPAP Standard 6 was not just generally accepted practice, "[i]t's required. It's the law for appraisers. It's not something – you can lose your license if you don't follow it. You can be banned from appraising if you don't follow it." Lifflander described the errors as "egregious, and actually, a bit perplexing." Lifflander stated

6

the likely reason for these errors was because Thomas was only certified as a residential appraiser at the time he conducted the McKee appraisal.

With respect to the appraisal conducted by Harvey for the 2009 reassessment cycle, Lifflander testified that it "was probably the worst work I've seen in my life." He explained that Hickey took all sales, ranging from $5 a foot to $170 a foot, averaged them out, and came out with a value for the subject, without making any adjustments. Lifflander stated:

> That would be very much like me going and valuing your house in this city, for instance, and taking every house in the city, mansions, fixers, everything, and getting an average, and once I got that average I'd say, 'That's your value for your house.' It doesn't make a bit of sense.
> . . . .
> In fact, if it could be done that way, we wouldn't need appraisers. A clerk could do it, just go ahead and average everything. An appraisal is not about averaging. You use averages of similar properties, but it's about finding properties that are similar and then making adjustments.

The second problem with Hickey's approach that Lifflander identified was how he determined depreciation. Hickey used depreciation to get a number he already had in mind, which is "the opposite of how you appraise. You look at the evidence, and that drives your number. You don't seek to get to a number that you've already preconceived should be the value." Another problem was that Hickey, like Thomas, failed to consider other listings. Lifflander explained that was also a violation of USPAP standards, because it is important to understand the current state of the market before valuing a property.

McKee then called Stuart Holtzman to testify as an expert in appraisal of real estate. Holtzman is a commercial real estate appraiser in Virginia and has appraised numerous industrial properties along the I-81 corridor. Holtzman was hired by McKee to conduct an independent appraisal of the property for the various tax years at issue. Holtzman testified that he believed

the Property had been assessed far above its market value. Holtzman stated the highest and best use of the Property was as a general manufacturing building. Holtzman explained that he was not able to develop the income approach because there was no definable rental market for similar properties in the region. Holtzman considered the cost approach, but it required making too many assumptions regarding depreciation and functional problems, so he did not give that approach much weight. Holtzman testified that he primarily relied on the sales comparison approach. He considered sales of other manufacturing or food processing plants along the I-81, I-64, and I -95 corridors. Holtzman concluded that the fair market value of the Property for 2011-2013 was $16,400,000, and for 2014 it was $17,200,000.

**The County's Evidence**

The County called William C. Harvey, II, a real estate appraiser in Virginia, as its expert witness. Harvey testified that he performed an appraisal of the Property for the County, and he determined that in 2011 the Property's fair market value was $33,000,000, in 2012 it was $32,790,000, in 2013 it was $32,900,000, and in 2014 it was $32,880,000. Harvey testified that he toured the Property before preparing his report. He considered the size and age of the Property, as well as its location along the I-81 corridor. Harvey testified that he used all three appraisal methods – cost, income, and sales comparison, in arriving at his conclusions, but he gave more weight to the sales comparison approach.

Harvey was also questioned about Holtzman's appraisal report. Harvey testified that Holtzman complied with the requirements for an appraisal, but he found Holtzman's methodology to be inappropriate as to various elements of the work. One reason was because Holtzman did not develop the income approach. Another problem was that for the sales comparison approach, Holtzman mainly considered vacant properties. Harvey also criticized

8

Holzman's statistical analysis of certain data that he used in his cost and sales approaches. Harvey did not express any opinion on Lifflander's report.

**McKee's Rebuttal Evidence**

McKee recalled Lifflander as a rebuttal witness. Lifflander testified that he had reviewed Harvey's report and his review of Harvey's report was admitted into evidence. Lifflander testified that Harvey's appraisal was "completely a sham because it's using information that should not be used," and that it was a "dishonest appraisal." Instead of using sales of manufacturing or industrial properties, Harvey relied on sales of distribution warehouses and on sales of leased fee properties. Lifflander explained that "[l]eased fee is a different ownership, as we've discussed a number of times, different bundle of rights, but these types of properties are investment-grade properties that corporate owners all over the country want to invest in." Lifflander stated that was the only way that Harvey could come up with an appraisal as high as he did. Lifflander testified that leased fee properties were a completely different type of property right, and that an investor would "pay a lot more for that than an industrial building which, by the way, you couldn't very easily lease out."

Lifflander also testified that Harvey violated USPAP standards because he did not disclose the comparable fee simple sales, and because Harvey did not explain why he did not use them in his appraisal. Lifflander stated that Harvey's cost approach was erroneous because Harvey did not allow for functional obsolescence in the Property, even though he considered the functional obsolescence in his sales approach. Lifflander testified that when he reworked Harvey's appraisal and corrected the mistakes that he found, he determined that the fair market value of the Property was $16,000,000 in 2011, $16,660,000 in 2012, $17,000,000 in 2013, and $17,660,000 in 2014.

9

McKee then recalled Holtzman as a rebuttal witness.  Holtzman reviewed Harvey's report, and testified regarding certain problems with Harvey's report.  First, Holtzman stated that if he had used the comparable sales that Harvey used, he "would be breaking every rule that [he'd] ever learned about appraising."  Holtzman, like Lifflander, testified that Harvey improperly used warehouses and triple net leased investments as comparable sales instead of other manufacturing facilities.

**The Circuit Court's Ruling**

McKee and the County gave their closing arguments, and the matter was submitted to the circuit court for decision.  The court issued its ruling from the bench, and the judge stated as follows:

> If all other things are equal, there's a presumption that the appraisal was done in a correct manner.  And after having heard all the evidence, I do find that the appraisal was conducted in the appropriate manner, and I find in favor of McKee – not of McKee – of the [C]ounty on their appraisal.
>
> It's very difficult when you're trying to look through 10 or 12 inches of paper, and I read them all, and I've listened to your argument, but the statutory scheme seems to be to have this presumption, and when you have an equality, everything is equal, that's what I'm left with.  And I'm going to have to comply, and my ruling is that they are in compliance, and I'm ruling in favor of McKee.

The County then asked the judge to clarify if he was finding in favor of the County or McKee, to which he responded, "I'm sorry.  Augusta County."

McKee then asked the court, for purposes of appeal, to explain what the court found about McKee's case that was not sufficient to reach a conclusion that it had overcome the presumption of correctness.  The circuit court then stated:

> There is a presumption – basically, you're saying you want to know why…. And "why" is because I think they were both in

10

equipoise. In other words, each case had opposing evidence, but I don't find the case you have presented to be sufficient to override that presumption. It's – when you're dealing with valuations, you can probably have ten appraisers and they'll have ten different opinions on values, and at this point you're the one with the burden of proof. The legislature clearly has given the presumption of correctness, and I don't feel the evidence you presented has overridden that.

I haven't seen anything that's been inherently an error or improperly done. The qualifications of all the witnesses is [sic] not being challenged. And we end up with a stalemate, and the legislature has decided to break the stalemate with their presumption.

The circuit court subsequently entered an order that upheld the County's tax assessments, and McKee appealed to this Court. We granted McKee's appeal on the following assignments of error:

1. The trial court erred by failing to order that the 2011-2014 assessments be corrected to the fair market values that McKee proved at trial because McKee's evidence is sufficient to rebut the presumption that the assessments were correct.

2. The trial court erred by its ruling that McKee's unrefuted evidence of the 55% difference [between] the 2011 assessment and the fair market value of the McKee property is not sufficient to rebut the presumption of correctness of the 2011 assessment.

3. The trial court erred by its ruling that McKee's unrefuted evidence of manifest error in Hickey's valuation methodology is not sufficient to rebut the presumption of correctness of the 2011 assessment.

4. The trial court erred by its ruling that McKee's unrefuted evidence that the 2012-2013 assessments were not arrived at in accordance with GAAP and Virginia law relating to valuation of property is not sufficient to rebut the presumption of correctness of the 2012-2013 assessments.

5. The trial court erred by its ruling that McKee's evidence that the 2014 assessment was not arrived at in accordance with GAAP and Virginia law relating to valuation of property is not sufficient to rebut the presumption of correctness of the 2014 assessment.

11

II.  Analysis

A.  Standard of Review

On appeal, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the prevailing party at trial.  *Western Refining Yorktown, Inc., v. County of York*, 292 Va. 804, 808 (2016).  The Constitution of Virginia requires that real estate be assessed at its fair market value.  *See* Va. Const. art. X, § 2.  In proceedings to seek relief from real property taxes, there is a presumption that the valuation determined by the assessor or as adjusted by the board of equalization is correct.  *See* Code § 58.1-3984(B).  This appeal requires us to construe relevant provisions of Code § 58.1-3984.  Issues of statutory construction are questions of law which we review de novo.  *Commonwealth v. Amos*, 287 Va. 301, 306 (2014).

B.  Tax Assessment for 2011

Code § 58.1-3984 was amended in 2011.  Our review of the tax assessment for 2011 is governed by the prior version of the statute, and our prior opinions that interpreted that statute.  The version of Code § 58.1-3984 in effect in 2011, stated that in proceedings to challenge erroneous assessments:

> [T]he burden of proof shall be upon the tax payer to show that the property in question is valued at more than its fair market value *or* that the assessment is not uniform in its application, *or* that the assessment is otherwise invalid or illegal, but it shall not be necessary for the taxpayer to show that intentional, systematic and willful discrimination has been made.

*See* former Code § 58.1-3984 (emphases added).  Assessments by taxing authorities are afforded a presumption of correctness, and the burden is on the taxpayer to rebut the presumption.  *Tidewater Psychiatric Institute, Inc. v. City of Virginia Beach*, 256 Va. 136, 140 (1998).  Generally, a taxing authority's assessment of a property's fair market value is presumed valid and a circuit court will reject and correct a tax authority's assessment only if the taxpayer

12

demonstrates that the taxing authority committed manifest error or disregarded controlling evidence in making the assessment. *Keswick Club, L.P. v. County of Albemarle*, 273 Va. 128, 136-37 (2007).

Taxing authorities commonly use one or more of three valuation approaches:  the cost approach, income approach, and sales approach. *Id.* at 137.  The cost approach estimates the value of property based on the current cost of the asset, minus depreciation or reduced value "from physical deterioration, functional obsolescence, and economic obsolescence." *Western Refining*, 292 Va. at 813.  The income approach "measures market value as the present worth of monetary benefits anticipated to be derived in the future from ownership of the asset." *Id.*  The sales approach "calls for an analysis and comparison of recent sales of comparable property." *Id.* "Ideally, an appraisal should, if possible, derive its final determination of a property's value using all three approaches in order to maximize the likelihood that the valuation accurately reflects the property's fair market value." *Keswick, 273 Va. at 137.*  In cases where a taxing authority bases an assessment of fair market value solely on one approach, the resulting assessment is still entitled to the presumption of validity so long as the taxing authority considered and properly rejected the other valuation methods. *Id.  See also Tidewater Psychiatric*, 256 Va. at 142.

In *Keswick*, we considered whether the assessor had rejected the sales and income approaches, and only relied on the cost approach. *Id.* at 138.  However, the evidence at trial demonstrated that the county assessor applied the cost approach "in an automatic fashion without sufficiently attempting to gather the data necessary to utilize the income approach or sales approach." *Id.* at 139.  We held that because the assessment was based on a single approach, and because the taxing authority had failed to consider and properly reject the other approaches, it

13

was not entitled a presumption of validity. *Id.* at 140. Therefore, the taxpayer was only required to show that the county's assessment was erroneous, not that the county committed manifest error or disregarding controlling evidence in making its decision. *Id.* at 141. Accordingly, we remanded the matter back to the circuit court for consideration under the proper and less stringent standard. *Id.*

Similarly, in *Board of Supervisors v. HCA Health Services*, 260 Va. 317 (2000), the taxing authority had only used the cost approach to reach its assessment. We determined that the taxing authority failed to consider and properly reject the other two methods of calculating the value of the taxpayer's property. *Id.* at 330. Accordingly, we held that the taxing authority's assessment "was not entitled to a presumption of correctness." *Id.* Because the assessment was not entitled to the presumption of correctness, the taxpayer "was not required to demonstrate that the [taxing authority] committed manifest error in making assessment, but was only required to meet the lesser burden of proving that the [taxing authority's] assessment was erroneous." *Id.*

The record in this case, including Hickey's own testimony, demonstrates that Hickey did not properly use any of the three generally accepted approaches to valuation. First, Hickey did not perform an income approach valuation at all. Second, to the extent he considered comparable sales, Hickey's methodology was so improper it did not meet the definition of the sales approach. Hickey identified 52 properties and simply used the average price per square foot of those properties as the price per square foot for the McKee property, without any adjustments for the size or location of the other properties. As Lifflander explained, although the sales approach involves the averages of properties, first an assessor must find similar properties and make necessary adjustments, which Hickey completely failed to do. Hickey also failed to properly utilize the cost approach. Although Hickey originally claimed that he used the cost

14

approach, he later testified that the CAMRA system that he used "is not really a cost approach." Instead of estimating depreciation based upon the Property's actual characteristics, Hickey used the average price per square foot to guide his depreciation.

Even though Hickey failed to properly utilize any of the three accepted valuation methods, the circuit court still applied the presumption of validity to his 2011 assessment. The trial judge referred to the presumption of validity several times in his ruling from the bench, including where he stated, "If all other things are equal, there's a presumption that the appraisal was done in a correct manner." The trial judge further stated, "To me, it's about equal on each side, but the tiebreaker has been put into the legislation that there's a presumption of correctness, and I find the evidence has not overcome that presumption." However, because this assessment did not properly apply any of the three accepted methods of valuation, it was not entitled to the presumption of validity. Therefore, the proper standard of review by the circuit court was the less stringent standard, requiring McKee "only to show that the [C]ounty's assessment was erroneous, not that the [C]ounty committed manifest error or disregarded controlling evidence in making its assessment." *See Keswick*, 273 Va. at 141. Accordingly, we will reverse the circuit court's judgment with respect to the 2011 assessment and remand the case for the circuit court to apply the proper and less stringent standard of review under the facts of this particular case.

C. Tax Assessments for 2012-2014

As stated above, the General Assembly amended Code § 58.1-3984 in 2011. Accordingly, McKee's challenges to the assessments for the years 2012-2014 are governed by the revised statute. Code § 58.1-3984(B) states in relevant part that:

> In circuit court proceedings to seek relief from real property taxes, there shall be a presumption that the valuation determined by the assessor or as adjusted by the board of equalization is correct. The burden of proof shall be on the taxpayer to rebut such presumption

15

and show by a preponderance of the evidence that the property in question is valued at more than its fair market value *or* that the assessment is not uniform in its application, ***and*** that it was not arrived at in accordance with generally accepted professional appraisal practices, procedures, rules and standards as prescribed by nationally recognized professional appraisal organizations such as the International Association of Assessing Officers (IAAO) and applicable Virginia law relating to valuation of property.

Code § 58-3984(B) (emphases added).  Under this revised statute, in order to rebut the presumption of correctness, a taxpayer must first prove either that (1) the property has been valued at more than its fair market value, or (2) that that the assessment is not uniform in its application.  If they prove either of those two prongs by a preponderance of evidence, then the taxpayer moves to the next requirement.  In this second step, the taxpayer must also prove by a preponderance of the evidence that the assessment was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations such the International Association of Assessing Officers and applicable Virginia law relating to the valuation of property.

These statutory revisions all relate to what the taxpayer must prove to rebut the presumption of correctness and obtain a judgment in their favor.  However, the preliminary question whether a taxing authority is entitled to the presumption of correctness must first be considered, and the revisions to Code § 58.1-3984 do not impact that inquiry.  As our prior decisions make clear, an assessment that is based on a single approach, where the taxing authority has failed to consider and properly reject the other approaches, is not entitled to this presumption of correctness.  *See Keswick,* 273 Va. at 140, and *HCA Health Servs.,* 260 Va. at 330.  Consequently, an assessment that is not based on any of the three accepted approaches would also not be entitled to a presumption of correctness.

**The 2012 and 2013 Assessments**

As discussed above, Hickey's assessment was not based on any of the three accepted approaches of valuation. Instead, he used the "Hickey Model," which was essentially based upon a rate per square foot that Hickey obtained by averaging 52 properties. In addition to using this model to prepare the 2011 assessment, Hickey also prepared the 2012 and 2013 assessments for the Property using this model. Therefore, the 2012 and 2013 assessments are based upon the same improper methodology and are not entitled to the presumption of correctness. Because the circuit court improperly relied upon the presumption of correctness in reaching its decision, we will reverse the judgment of the circuit court and remand for the circuit court to apply the proper and less stringent standard of review to the 2012 and 2013 assessments as well.

**The 2014 Assessment**

The County hired Wingate and Associates, Ltd. to perform the 2014 general reassessment. Although Wingate told the County that Miles Willett, a certified general real estate appraiser, would serve as Project Manager, the McKee assessment was instead performed by Thomas. Thomas admitted at trial that at the time he assessed the Property, he was only a licensed residential real estate appraiser, and was not certified as a general real estate appraiser. Thomas's work was performed with no guidance or supervision from Willett. In addition to not being properly licensed, Thomas admitted that his appraisal did not comply with USPAP standard 6-8. Thomas further admitted that he was not an employee of the County, and therefore did not qualify for the exemption from USPAP requirements for "local employees performing their official capacity."

Thomas' assessment was based upon a single valuation approach, the cost approach. Thomas had classified the Property as a special use property for food processing. He testified

17

that he was unable to use the sales approach due to "the lack of comparable sales of comparable food processing plants in the eastern region of the United States." Thomas testified that he rejected the income approach because the Property was owner-occupied and because, in his opinion, rental data for food processing plants would be unavailable.

Because Thomas' assessment of fair market value is based solely on the cost approach, the resulting assessment is only entitled to the presumption of correctness if the taxing authority considered and properly rejected the other valuation methods. *See Keswick*, 273 Va. at 137. Therefore, we must determine whether the evidence in this case reflects that Thomas considered and properly rejected the income and sales approaches before relying solely on the cost approach. *Id.* at 137-38.

Regarding the sales approach, Thomas testified that he was unable to use this approach because there were no comparable sales for food processing plants in the eastern region of the United States. However, Thomas admitted that, although the market for the Property was national in scope, he did not search for comparable sales outside of the eastern region of the United States. Lifflander also testified that Thomas had erred in classifying the Property as a special use property, because the Property was a rectangular building that could be used for many different manufacturing uses. It is therefore also possible that, by only considering special use food processing plants, Thomas necessarily limited the potential comparable sales that could be considered.

With respect to the income approach, Thomas rejected it because the Property was owner-occupied and because, in his opinion, rental data for food processing plants would be unavailable. However, he also admitted that he did not search for rental data outside of Augusta County, despite having admitted that the market for this Property was national in scope. Thomas

18

provided no explanation for why he did not perform a nationwide search for comparable sales or rental data. Accordingly, the evidence at trial demonstrates that Thomas applied the cost approach without sufficiently attempting to gather the data necessary to utilize the income or sales approach. As discussed above, an assessment based on a single approach to the determination of market value, where the taxing authority failed to consider and property reject the other approaches, is not entitled to a presumption of validity. *Keswick* at 140, and *HCA Health Servs.*, 260 Va. at 329-30. Therefore, the circuit court erred when it applied the presumption of correctness to the assessments at issue in this case. On remand, McKee will still be required to prove the elements of Code § 58.1-3984(B). However, the County will not be entitled to the presumption of correctness set forth in that statute.

### III. Conclusion

For the reasons stated, we will reverse the judgment of the circuit court. However, we are aware that the trial judge who presided over this matter is retired and unavailable for recall under Code § 17.1-106. Therefore, it will not be possible to remand this matter for the original trial judge to reevaluate the evidence heard at trial and consider it under the proper standard or review, without the presumption of correctness. Given the voluminous record in this case,[2] and the numerous witnesses who testified at trial, it may not be feasible for a new judge to review the existing record, to make credibility determinations, and attempt to apply the proper standard of review to these assessments. Accordingly, due to the unique circumstances of this case and the trial judge's unavailability, we will remand this matter for a new trial, consistent with holdings expressed in this opinion. However, if the parties and the circuit court all agree to forego a new

---

[2] There are seven volumes of the appendix, totaling over 3400 pages, and the circuit court record contains over 5700 pages.

trial and have the circuit court review the existing record under the proper standard of review, our remand authorizes the circuit court to exercise its discretion whether to conduct a new trial or limit its review to the existing record.

*Reversed and remanded*.