COURT OF APPEALS OF VIRGINIA

Present:  Judges Causey, Raphael and Senior Judge Clements
Argued at Leesburg, Virginia

PUBLISHED

CHRISTOPHER O. PARRISH

v.        Record No. 1687-22-4

MIKEYA VANCE

OPINION BY
JUDGE DORIS HENDERSON CAUSEY
MARCH 12, 2024

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Grace Burke Carroll, Judge

James M. Stewart, Jr., for appellant.

Karen Leiser (The Leiser Law Firm, on brief), for appellee.

Christopher O. Parrish, landlord, appeals the circuit court's judgment, finding for Mikeya

Vance, tenant, on her tenant's assertion related to a flea infestation of the rental property.  Parrish

argues that the lease entered by the parties placed the responsibility to mitigate flea infestations

on Vance, even if the lease conflicts with the Virginia Residential Landlord Tenant Act

("VRLTA").  He also asserts that the evidence is insufficient to establish factual conditions

required for recovery under the VRLTA.  Lastly, he contends that the circuit court erred in

admitting evidence and violated due process by failing to allow him to "put on his entire case."

We hold that the VRLTA provides tenants a warranty of habitability that a landlord and tenant

cannot waive by agreement.  We also conclude that the evidence is sufficient for Vance to

recover under the VRLTA, the circuit court did not err in admitting evidence, and Parrish's due

process claim is procedurally barred.  Thus, we affirm the circuit court's judgment.

BACKGROUND[1]

On September 2, 2021, Mikeya Vance and Christopher Parrish entered a lease for a single-family home located in Alexandria, Virginia. Before Vance took possession of the rental property, she had a virtual walk through via FaceTime. She described the property as "filthy" and asked Parrish if he would have the house professionally cleaned. Parrish told her the house would not be professionally cleaned as he would clean the house himself.

Vance took possession of the property on October 15, 2021, and observed fleas in her bed that same day. Vance said she left the property temporarily and began staying somewhere else beginning on October 25, 2021, because she could not live with fleas. She sent an email notifying Parrish of the fleas that same day.

Parrish said he would have the house treated and instructed Vance to call an exterminator, Pest Now. He provided the exterminator's number and told her to set up an appointment. He told her he would cover $200 of the extermination costs. Pest Now treated the property on October 28, 2021. Pest Now advised that the property would need "several treatments." Although Vance had not been living at the property since October 25, 2021, she would visit the property "like twice a month." After the Pest Now treatment on October 28, Vance still found fleas in her bed and stated that the amount of fleas was the same as before the treatment.[2]

---

[1] "We review the evidence in the light most favorable to the prevailing party, in this instance [Vance]." *W. Ref. Yorktown, Inc. v. Cnty. of York*, 292 Va. 804, 808 (2016).

[2] Vance stated that "when [she] would go into the house [she] would walk out with fleas on [her]." Vance said that there were fleas "[b]eside the windowsill in the master bedroom and also in the basement" and "in the second guest bedroom as well." She testified that there were "several fleas," and there were "like 50" by the windowsill and that she "couldn't even capture how many w[ere] in [her] bed." Vance stated that there were "a lot" of fleas on her person and that "[t]hey ate [her] body pretty bad."

Vance told Parrish about the continued presence of the fleas. Parrish told her that he would have the property inspected and treated for fleas on either November 11 or 12 of 2021. That inspection and treatment never happened. Thus, on November 17, 2021, Vance sought to terminate her lease, but Parrish refused.

During one of her visits to the property, Vance noticed that there was still flea activity. To try to save her personal property, Vance hired and paid for another exterminator, Highland Eco Pest Control ("Highland"). Highland serviced the property on November 24, 2021. After Highland's treatment, Vance's "coworker vacuumed and cleaned the house thoroughly every day for two weeks," as Highland had instructed. Vance did not call Highland for follow-up services "because at the time Chris Parrish said he was going to have Orkin and Pest Now come to the house." Parrish sent one exterminator to the property on November 29, 2021, and another from Orkin on November 30, 2021. According to Orkin, there was no evidence of flea activity at the property. But Vance testified that even "when [Parrish] brought Orkin" to the property, she still saw fleas there. She testified that she had "put down" "flea [s]trips" in the property and the flea strips "had new fleas on them."

On January 5, 2022, Vance filed a Tenant's Assertion and Complaint against Parrish in the Fairfax County General District Court. Vance alleged that the house that she was renting from Parrish was infested with fleas. Vance sought recovery of rent that she had placed into escrow, rent abatement for rent paid to Parrish during prior months in which the infestation was ongoing, and termination of the rental lease under Code § 55.1-1244. The case went to trial and that court entered judgment for Parrish. Vance appealed to the Fairfax County Circuit Court.[3] The case proceeded to a one-day bench trial on August 31, 2022.

---

[3] Vance filed a bill of particulars elaborating on her allegations and clarifying that she was also requesting attorney fees. Parrish filed a counterclaim seeking to recover for damage that Vance allegedly caused to the property, termination of the lease, and attorney fees.

At trial, the cause and the timeline of the flea infestation were the central issues of contention. Vance argued that, due to the timing of the infestation and fleas needing living hosts to survive, it was likely that the fleas were already in the house when she arrived. Parrish argued that there was no evidence of fleas existing in the house before Vance's arrival and, therefore, Vance must have brought the fleas herself.

The parties also presented evidence from pest control technicians relating to the infestation. Parrish filed a motion *in limine* to exclude "any expert evidence or testimony" from Vance's pest control technician, Jerrell Singleton, because Vance had failed to timely designate Singleton as an expert witness. During the motion hearing, Vance stated that Singleton's testimony would be based on Singleton's service report that had previously been provided to Parrish. The circuit court ruled that because Vance had failed to timely designate Singleton as an expert witness, Vance was precluded from introducing any expert evidence from Singleton. But the circuit court also ruled that because Singleton had treated the property, Singleton could provide evidence based on his personal observations. The circuit court noted that "should [Singleton's evidence] bleed into the nature of an expert opinion, [it would] rely on counsel to object." As a lay witness, Singleton testified that "throughout the entire process" of his treating the property, "fleas were jumping on [him]."

Later, Vance sought to introduce a service report prepared by Singleton. Parrish objected on the grounds that Singleton could not properly authenticate the report and Singleton was precluded from providing expert evidence. The court overruled Parrish's objection on authentication. It admitted only the portions of the report that it deemed to be lay witness testimony and excluded the portions it deemed to be "more along the lines of an expert opinion." Yet, later in the trial, Parrish moved to admit "the entirety" of Singleton's service report into evidence. After admission of the report, Singleton testified that the life cycle of a flea can last

for "months" and that fleas can lay dormant for "up to at least six months." Parrish objected, but the circuit court overruled the objection.

The circuit court ruled from the bench, finding for Vance, terminating the lease, and awarding Vance the rent she paid into escrow as well as attorney fees. The circuit court denied Parrish's counterclaim, finding that there was not "any evidence to support that counterclaim of damage." The circuit court entered an order in accord with these rulings on September 16, 2022.

Parrish filed two motions to reconsider and to suspend the circuit court's order while the hearing on the two motions was pending. In the motions to reconsider, Parrish requested that the court hold a new trial.[4] The circuit court entered an order on September 30, 2022, suspending the September 16, 2022 order "until October 7, 2022, at which time the Final Order shall go into effect and any and all appellate and/or other deadlines shall begin to run." On October 12, 2022, the court entered a final order denying Parrish's motions to reconsider. Parrish appeals.

ANALYSIS

I. VRLTA and Warranty of Habitability

Parrish argues that the circuit court erred as a matter of law in concluding that Parrish (the landlord), not Vance (the tenant), was responsible for eliminating household pests after Vance took possession of the property. Parrish asserts that the lease signed by both parties transferred this responsibility to the tenant. The lease states "Tenant shall be responsible for . . . [c]ontrolling and eliminating household pests including but not limited to fleas, ticks, bed bugs, roaches, silverfish, ants, crickets, and rodents during occupancy. Tenant shall be responsible for

---

[4] Parrish argued that the circuit court erred by (1) finding that Vance did not bear responsibility for causing the flea infestation herself; (2) admitting expert testimony from Vance's witness, Singleton, despite granting Parrish's motion *in limine* to prevent Singleton from testifying as an expert; (3) admitting an expert report from Singleton; and (4) not allowing Parrish sufficient time to present his evidence in support of his defense and his counterclaim, in violation of Parrish's constitutional right to due process.

the costs of the elimination of all such pests and vermin during occupancy and upon vacating Premises." Vance argues that Virginia law imposes a nonwaivable warranty of habitability on residential leases and that the flea infestation and Parrish's failure effectively to resolve it breached that warranty.

This leads to the question of whether lease agreements may waive rights or remedies made non-waivable by statute. Virginia law says no. Subsection A of Code § 55.1-1208 ("Prohibited provisions in rental agreements") states that "[a] rental agreement shall not contain provisions that the tenant: . . . [a]grees to waive or forgo rights or remedies under this chapter." Subsection B states that "[a]ny provision prohibited by subsection A that is included in a rental agreement is unenforceable. If a landlord brings an action to enforce any such provision, the tenant may recover actual damages sustained by him and reasonable attorney fees." Therefore, when a lease provision purports to waive tenant's rights or remedies required by law, the law controls and the lease provision is unenforceable.

Thus, we begin by considering whether Virginia law imposes a nonwaivable warranty of habitability.

"[W]e review the trial court's statutory interpretations and legal conclusions *de novo.*" *Sink v. Commonwealth*, 28 Va. App. 655, 658 (1998). "When interpreting a statute or ordinance, 'our primary objective is "to ascertain and give effect to legislative intent," as expressed by the language used in the statute.'" *Berry v. Bd. of Supervisors of Fairfax Cnty.*, ___ Va. ___, ___ (Mar. 23, 2023) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). "[I]f the comparison of one clause with the rest of the statute makes a certain proposition clear and undoubted, the act must be construed accordingly and ought to be so construed as to make it a consistent whole." *Hodges v. Commonwealth, Dep't of Soc. Servs.,*

*Div. of Child Support Enf't ex rel. Comptroller of Virginia*, 45 Va. App. 118, 133 (2005) (quoting Norman J. Singer, *Statutes and Statutory Construction* § 46:05 (6th ed. 2000)).

Virginia Code §§ 55.1-1200 to -1262 comprise the VRLTA. The VRLTA imposes different duties on residential tenants and landlords.

One duty the VRLTA imposes on tenants is to "[k]eep that part of the dwelling unit and the part of the premises that he occupies free from insects and pests, as those terms are defined in § 3.2-3900, and promptly notify the landlord of the existence of any insects or pests." Code § 55.1-1227(A)(3) ("Tenant to maintain dwelling unit"). This section requires tenants to take an active role in keeping the dwelling unit free from pests by promptly notifying the landlord of any infestations. However, under the warranty of habitability imposed on the landlord by Code § 55.1-1220 ("Landlord to maintain fit premises"), it is ultimately the landlord's duty to keep the premises habitable, as discussed below.

Under Code § 55.1-1220(A)(1), a "landlord shall . . . [c]omply with the requirements of applicable building and housing codes materially affecting health and safety." Further, a landlord must "[m]ake all repairs and *do whatever is necessary* to put and *keep the premises in a fit and habitable condition*." Code § 55.1-1220(A)(2) (emphases added). Virginia has not yet expressly defined the terms "fit and habitable." "Habitable" means "adequate, appropriate for residence, capable of being inhabited, comfortable, fit for dwelling, fit for habitation, fit to be occupied, fit to live in, inhabitable, livable, residential, suitable, suitable for living in, tenantable." *Habitable*, *Burton's Legal Thesaurus* (6th ed. 2021). Other jurisdictions have defined "habitable" to mean being in a condition that "permit[s] the inhabitants to live free of serious defects to health and safety," *Guerdon Indus., Inc. v. Gentry*, 531 So. 2d 1202, 1206 (Miss. 1988) (construing the implied warranty of merchantability in the mobile home context), or "suitab[le] for living purposes; the home must be occupiable," *Aronsohn v. Mandara*, 484 A.2d

- 7 -

675, 681 (N.J. 1984). "Fit and proper" means "[h]aving the necessary and desired qualities for a particular purpose." *Fit and Proper*, *Black's Law Dictionary* (11th ed. 2019). Thus "fit" means suitable, proper, appropriate, and/or fitting. Therefore, "fit and habitable" means that all conditions in both definitions must be met. The premises must be livable, free from serious defects to health and safety, and have necessary qualities for habitability.

An infestation of fleas is clearly a condition that can make a dwelling unit not livable, nor free from serious defects to health and safety, and may deprive the unit of the necessary qualities for the particular purpose of human living. Fleas may pose a serious threat to health and safety. *E.g.*, *Felice v. Warf*, 106 N.Y.S.3d 837, 847 (City Ct. 2019) ("[A] flea infestation could cause a breach of the warranty of habitability and could lead to a constructive eviction of a tenant under the appropriate circumstances . . . ."). Fleas are known to carry disease and caused the bubonic plague pandemic, one of the most fatal pandemics in history.[5]

The warranty of habitability provided in Code § 55.1-1220(A) is not waivable.

A plain reading of Code § 55.1-1220(A) suggests that a tenant's right to have the landlord "[m]ake *all* repairs and do *whatever* is necessary to put and keep the premises in a fit and habitable condition" cannot be waived. (Emphases added). Section (D) of the same statute states that:

> The landlord and tenant may agree in writing that the tenant
> perform the landlord's duties specified in subdivisions A 3, 6, and
> 7 and also specified repairs, maintenance tasks, alterations, and
> remodeling, but only if the transaction is entered into in good faith
> and not for the purpose of evading the obligations of the landlord

---

[5] Fleas "act as vectors for disease including typhus, rickettsial disease, *bubonic plague*, protozoan, and helminth infestations." Jackie Anderson & Elizabeth Paterek, *Flea Bites*, STATPEARLS (Aug. 8, 2023), https://perma.cc/J6AN-ERLV (emphasis added). "Plague bacteria are most often transmitted by the bite of an infected flea." *Ecology and Transmission | Plague*, CDC (July 31, 2019), https://perma.cc/WJ7S-AQ6E. "The Black Death was a devastating global epidemic of bubonic plague that struck Europe and Asia in the mid-1300s." Amanda Onion, Missy Sullivan, Matt Mullen & Christian Zapata, *Black Death*, History (Mar. 28, 2023), https://perma.cc/LK52-69DV.

and if the agreement does not diminish or affect the obligation of the landlord to other tenants in the premises.

Code § 55.1-1220(D). Construing Code § 55.1-1220 as a consistent whole, the fact that section (D) states that subsections 3, 6, and 7 of section (A) can be waived by an agreement between a landlord and tenant in writing suggests that the other unnamed sections cannot be waived. These other sections include the landlord's duty to "keep the premises in a fit and habitable condition."

In addition, our Supreme Court has likened Code § 55.1-1220(A)'s predecessor, Code § 55-248.13(A), to the common law "'warranty of habitability doctrine . . . recognized' in several jurisdictions." *Isbell v. Com. Inv. Assocs., Inc.*, 273 Va. 605, 615 (2007) ("The language appearing in [Uniform Residential Landlord and Tenant Act] § 2.104(a) is identical to the terms of Code § 55-248.13(A) at issue here.").[6]

Thus, based on a plain reading of Code § 55.1-1220 in context with the rest of the VRLTA and our prior precedent, we hold that Code § 55.1-1220(A) provides tenants a warranty of habitability that a landlord and tenant cannot waive by agreement. Here, the lease agreement between Parrish and Vance attempted to shift the burden to deal with insect infestations to Vance. However, the lease could not do so because Vance did not waive the warranty of habitability by signing the lease agreement.

---

[6] "The drafters' comment accompanying URLTA § 2.104 states, . . . '[t]his section follows the warranty of habitability doctrine now recognized' in several jurisdictions." *Isbell*, 273 Va. at 615. In other jurisdictions as well, lease provisions cannot waive the implied warranty of habitability. *E.g.*, N.Y. Real Prop. Law § 235-b ("Warranty of habitability") (McKinney 2023) ("2. Any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section shall be void as contrary to public policy."); Residential Tenants' Rights Guide, Office of the New York State Attorney General (Sept. 15, 2023, 3:30 PM), https://ag.ny.gov/publications/residential-tenants-rights-guide ("Any lease provision that waives [the warranty of habitability] is contrary to public policy and is therefore void. Examples of a breach of this warranty include the failure to provide heat or hot water on a regular basis, or the failure to rid an apartment of an insect infestation."); *Knight v. Hallsthammar*, 623 P.2d 268, 272 (Cal. 1981) (recognizing that "an implied warranty of habitability and . . . a public policy which generally prohibits waiver of that warranty is consistent with California's statutory pattern of landlord-tenant relations").

## II. Sufficiency of the Evidence

Parrish advances several arguments related to the sufficiency of the evidence for Vance's tenant's assertion. We conclude the evidence sufficiently establishes that (1) there was a flea infestation on the premises; (2) Vance gave prompt written notice to Parrish of the infestation; (3) Parrish had a reasonable opportunity to remedy the infestation but failed to do so; and (4) Vance paid into the court the amount of rent called for under the rental agreement. Thus, the circuit court did not err in ruling for Vance on the tenant's assertion.

"The trial court's rulings come to us with a presumption of correctness. The trial court is presumed to know and correctly apply the law 'absent clear evidence to the contrary in the record.'" *Rainey v. Rainey*, 74 Va. App. 359, 377 (2022) (citations omitted) (quoting *Milam v. Milam*, 65 Va. App. 439, 466 (2015)). Whether a property is habitable is a question of fact, which makes it a factual finding that is reviewable only if it is plainly wrong or unsupported by the evidence. *Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 58 (2021) (noting that this Court will not disturb the circuit court's factual determinations unless "they are 'plainly wrong or without evidence to support [them]'" (quoting Code § 8.01-680)). "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)).

As stated above, the warranty of habitability in Code § 55.1-1220 cannot be waived. When a landlord breaches this nonwaivable warranty of habitability, a tenant may file a tenant's assertion under Code § 55.1-1244 ("Tenant's assertion; rent escrow"). Under Code § 55.1-1244, a tenant may request relief from a condition that exists on the leased premises that falls under approximately six broad categories. The first two categories are conditions that (1) "constitute[] a material noncompliance by the landlord with the rental agreement"; or (2) "constitute[] a

- 10 -

material noncompliance by the landlord . . . with provisions of law." The other four categories are conditions that "if not promptly corrected, will constitute a [(3)] fire hazard or serious threat to the [(4)] life, [(5)] health, or [(6)] safety of occupants of the premises," which include, but are not limited to:

> a lack of heat or hot or cold running water, except where the tenant is responsible for payment of the utility charge and where the lack of such heat or hot or cold running water is the direct result of the tenant's failure to pay the utility charge; a lack of light, electricity, or adequate sewage disposal facilities; an infestation of rodents; or the existence of paint containing lead pigment on surfaces within the dwelling, provided that the landlord has notice of such paint.

Code § 55.1-1244(A).

A flea infestation can fall under many of the categories of conditions outlined in Code § 55.1-1244. As stated above, the VRLTA imposes a duty on landlords to keep the premises in a fit and habitable condition, and the presence of fleas certainly can render the premises uninhabitable. *See Felice*, 106 N.Y.S.3d at 847. Whether that is true in any particular case is a factual question, and the facts here support that finding.

To obtain relief under this section, a tenant must "show to the satisfaction of the court that": (1) the tenant gave the landlord written notice of the condition "or was notified of such condition by a violation or condemnation notice from an appropriate state or local agency"; (2) the landlord or his agent refused to remedy the condition after "having a reasonable opportunity

- 11 -

to do so"[7]; and (3) "the tenant has paid into court the amount of rent called for under the rental agreement."[8]  Code § 55.1-1244(B).

A landlord may rebut a tenant's assertion by "establish[ing] to the satisfaction of the court that" the complained-of condition: (1) "do[es] not in fact exist"; (2) "ha[s] been removed or remedied"; (3) was "caused by the tenant, his guest or invitee, members of the family of such tenant, or a guest or invitee of such family member"; or (4) "the tenant has unreasonably refused entry to the landlord to the premises for the purpose of correcting [the] condition[]."  Code § 55.1-1244(C).

Here, the evidence supports the circuit court's judgment.  The evidence sufficiently establishes that: (1) a condition existed on the premises that "constitute[d] a material noncompliance by the landlord . . . with provisions of law"; (2) Vance gave Parrish written notice of the condition;[9] (3) Parrish refused to remedy the condition after "having a reasonable opportunity to do so"; and (4) Vance "paid into court the amount of rent called for under the rental agreement."  A tenant's remedies for a successful tenant's assertion are found in Code § 55.1-1244 (D).  These possible remedies include, but are not limited to, a court order:

---

[7] "For the purposes of this subsection, what period of time shall be deemed to be unreasonable delay is left to the discretion of the court, except that there shall be a rebuttable presumption that a period in excess of 30 days from receipt of the notification by the landlord is unreasonable."  Code § 55.1-1244(B)(1).

[8] The tenant must make this payment "within five days of the date due under the rental agreement, unless or until such amount is modified by subsequent order of the court under this chapter."  Code § 55.1-1244(B)(2).
Parrish does not dispute that Vance paid the required amount of rent into court.

[9] Per Code § 55.1-1227, discussed above in Section II., Vance had to show that she notified the landlord of the infestation.  Vance's establishment of the elements to prevail on a tenant's assertion would also satisfy the duty imposed on her by Code § 55.1-1227.

1. Terminating the rental agreement upon the request of the tenant . . . ;

2. Ordering all moneys already accumulated in escrow disbursed . . . to the tenant in accordance with this chapter;

3. Ordering that the escrow be continued until the conditions causing the complaint are remedied;

4. Ordering that the amount of rent, whether paid into the escrow account or paid to the landlord, be abated as determined by the court in such an amount as may be equitable to represent the existence of any condition found by the court to exist.  In all cases where the court deems that the tenant is entitled to relief under this chapter, the burden shall be upon the landlord to show cause why there should not be an abatement of rent;

5. Ordering any amount of moneys accumulated in escrow disbursed to the tenant where the landlord refuses to make repairs after a reasonable time or to the landlord or to a contractor chosen by the landlord in order to make repairs or to otherwise remedy the condition.  In either case, the court shall in its order insure that moneys thus disbursed will be in fact used for the purpose of making repairs or effecting a remedy;

6. Referring any matter before the court to the proper state or local agency for investigation and report and granting a continuance of the action or complaint pending receipt of such investigation and report.  When such a continuance is granted, the tenant shall deposit with the court, within five days of date due under the rental agreement, subject to any abatement under this section, rents that become due during the period of the continuance, to be held by the court pending its further order;

Code § 55.1-1244(D). "If the tenant proceeds under this subsection, [s]he may not proceed under any other section of this article[10] as to that breach."[11] Code § 55.1-1244(F).

Additionally, a tenant's remedy for a landlord's violation of the warranty of habitability "is termination of the rental agreement after providing written notice to the landlord and an opportunity for the landlord to correct the breach." *Isbell*, 273 Va. at 616 (discussing predecessor to Code § 55.1-1220(A), Code § 55-248.13(A)). "A tenant may also recover damages and obtain injunctive relief." *Id.*

During the hearing, Vance testified that there were a lot of fleas on her person that "ate [her] body pretty bad." Singleton, the Highland pest technician, also testified to the numerous

---

[10] Code § 55.1-1244 is contained in Article 4 of the VRLTA, which is entitled "Tenant Remedies." Article 4 encompasses Code §§ 55.1-1234 through 55.1-1244.1.
        Other relief available to a tenant in this article includes actions under Code §§ 55.1-1243.1, 55.1-1234. A tenant may bring an action under Code § 55.1-1243.1 if the tenant establishes "that h[er] landlord has willfully and without authority from the court (i) removed or excluded the tenant from the dwelling unit unlawfully, (ii) interrupted or caused the interruption of an essential service to the tenant, or (iii) taken action to make the premises unsafe for habitation." "Essential service" is defined in Code § 55.1-1200. If the tenant suffered any of these actions, the court may order "the landlord to (i) allow the tenant to recover possession of the dwelling unit, (ii) resume any such interrupted essential service, or (iii) fix any willful actions taken by the landlord or his agent to make the premises unsafe for habitation." Code § 55.1-1243.1(B).
        Under Code § 55.1-1234:

> Except as provided in this chapter, if there is a material
> noncompliance by the landlord with the rental agreement or a
> noncompliance with any provision of this chapter, materially
> affecting health and safety, the tenant may serve a written notice
> on the landlord specifying the acts and omissions constituting the
> breach and stating that the rental agreement will terminate upon a
> date not less than 30 days after receipt of the notice if such breach
> is not remedied in 21 days.

[11] Because Vance did not bring a constructive eviction action, *see Buchanan v. Orange*, 118 Va. 511, 516 (1916), we do not address whether she would have been entitled to relief on a constructive eviction theory. *See Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)).

fleas in the house, stating that fleas jumped on him the entire time he treated the property. Based on this evidence, the circuit court was not plainly wrong in finding that the property was uninhabitable. The severity of this flea infestation was a condition that constituted a material noncompliance by Parrish with the rental agreement and the provisions of law requiring him to keep the premises fit and habitable.

Moreover, Vance gave Parrish the opportunity to correct the issue. The record shows that Vance notified Parrish of the flea problem in writing, via email, on October 25, 2021, but the property was still flea-infested as of November 30, 2021. Under Code § 55.1-1244(B), there is "a rebuttable presumption that a period in excess of 30 days from receipt of the notification by the landlord is unreasonable." Although Parrish disputes those facts and asserts that his pest technician did not find fleas, the circuit court was entitled to credit Vance's contrary evidence. And although Parrish asserts that Vance caused the flea infestation, the circuit court was entitled to credit the expert testimony that the flea activity had been ongoing for months, even before Vance took possession of the property.

Parrish also argues that the circuit court erred in granting judgment to Vance, as no evidence was presented at trial that the flea infestation existed when Vance filed the tenant's assertion as required by Code § 55.l-1244(A) ("The tenant may assert that there *exists* upon the leased premises a condition that constitutes a material noncompliance by the landlord with the rental agreement or with provisions of law . . . ." (emphasis added)). Taken in the light most favorable to Vance, however, the circuit court could reasonably find that the flea problem had not abated when Vance filed her tenant's assertion on January 5, 2022. Vance testified that the exterminator who treated the property in October said that "several treatments" would be necessary. But Parrish did not arrange for further treatments. After the October treatment, Vance took a video on November 3 showing that fleas were still present. After moving out,

- 15 -

Vance visited the property about "twice a month." She testified that she *still* saw "flea activity," though the high level of flea activity was much less ("gone") compared to before. Given Parrish's failure to provide the multiple flea treatments required to abate the problem and Vance's testimony about the continuing flea activity, the circuit court could reasonably find that the flea problem continued to exist when Vance filed her tenant's assertion.

Thus, we affirm the circuit court's rulings that Vance "carried her burden," "that the presence of the fleas made it to the point where . . . it was unhealthy to be in and that the matter wasn't resolved by the landlord." The flea infestation was a condition that was materially noncompliant with the warranty of habitability provided by Code § 55.1-1220(A); Parrish failed to correct this condition within a reasonable time, and Vance was entitled to termination of the lease and damages.

### III. Admission of Singleton's Expert Report and Testimony

Parrish also argues that the circuit court erred in admitting Singleton's service report and expert testimony because (1) Singleton "could not authenticate such document as he was not the custodian of records"; and (2) the circuit court had already ruled that any expert evidence from Singleton was not admissible because Singleton was not timely designated as an expert.

"Appellate courts review a circuit court's ruling on the admissibility of evidence under an abuse of discretion standard." *Davenport v. Util. Trailer Mfg. Co.*, 74 Va. App. 181, 206 (2022). "A court always abuses its discretion when it makes an error of law." *Id.* "A court can also abuse its discretion in three other ways: (1) by failing to consider a relevant factor that should have been given significant weight, (2) by considering and giving significant weight to an irrelevant or improper factor, and (3) by committing a clear error of judgment, even while weighing 'all proper factors.'" *Id*. (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013)).

To authenticate a document under Rule of Evidence 2:803(6), the proponent must show:

> (A) the record was made at or near the time of the acts, events, calculations, or conditions by—or from information transmitted by—someone with knowledge; (B) the record was made and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making and keeping the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 2:902(6) or with a statute permitting certification; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Here, Singleton properly authenticated the report through his testimony. Singleton identified the report as "a service report" that he drafted on November 24, 2021, the same day he treated the property. He also testified that the exhibit was a true and accurate copy of his report. Thus, the circuit court did not err in ruling that Singleton properly authenticated the service report.

The circuit court also did not err in admitting expert evidence from Singleton because Parrish first introduced the expert evidence he sought to exclude. Parrish asked for Singleton's service report to be admitted in its "entirety," including the portions the circuit court had previously deemed "expert testimony" and thus excluded. Singleton's subsequent expert testimony that flea life cycles can span months was based on this report, which included Singleton's expert opinion that the flea activity had "been ongoing for several months." "[A] party [may not] invite error and then attempt to take advantage of the situation created by his own wrong." *Cangiano v. LSH Bldg. Co*., 271 Va. 171, 181 (2006). Therefore, we affirm the circuit court's decision and hold that the circuit court did not err by admitting Singleton's expert report and testimony.

## IV. Due Process

Finally, Parrish argues that his due process rights were violated by not being able to "put on his entire case."

Under Rule 5A:18, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." "A mere statement that the judgment or award is contrary to the law and the evidence is not sufficient to preserve the issue for appellate review." *Id.* "Rule 5A:18 requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010).

Here, Parrish conceded at oral argument that he did not contemporaneously object to the circuit court's schedule and his alleged inability to put on his entire case. At the close of evidence, Parrish did not make any objections. Instead, he stated, "That's all, Judge," and the court proceeded to closing arguments. Parrish did not make the argument he makes now, contesting his inability to put on his entire case. At oral argument, Parrish conceded that he did not raise that argument for the first time until his motion to reconsider, in which he objected to the circuit court's written order entered September 16, 2022, after the trial was over. That objection came too late. *E.g.*, *Carter v. Commonwealth*, 293 Va. 537, 549 (2017) ("We have repeatedly held that in order to preserve an issue for appeal a party must make known to the trial court the action which he desires the court to take or his objections to the actions and the grounds therefore 'at a point in the proceeding when the trial court is in a position not only to consider the asserted error, but also to rectify the effect of the asserted error.'" (quoting *Scialdone v.*

- 18 -

*Commonwealth*, 279 Va. 422, 437 (2010))). Because Parrish did not make his objection at a time when the circuit court could have corrected the error, his argument is barred on appeal.

CONCLUSION

The VRLTA provides tenants a warranty of habitability that cannot be waived. The evidence sufficiently established that Vance was entitled to recover under a tenant's assertion for the property's noncompliance with this warranty of habitability. The circuit court did not err in admitting the evidence contested by Parrish, and Parrish's due process argument is procedurally barred. Thus, we uphold the circuit court's judgment for Vance.

*Affirmed*.