COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Fulton and White
Argued at Salem, Virginia


EQT PRODUCTION COMPANY, ET AL.

                                        MEMORANDUM OPINION[*] BY
v.          Record No. 0155-24-3          JUDGE KIMBERLEY SLAYTON WHITE
                                             MARCH 18, 2025
COUNTY OF WISE, VIRGINIA, ET AL.


FROM THE CIRCUIT COURT OF WISE COUNTY
David B. Carson, Judge Designate

Stephen M. Hodges (Seth M. Land; Penn, Stuart & Eskridge, on
briefs), for appellants.

Paul G. Beers (Harwell M. Darby, Jr.; Glenn, Feldmann, Darby &
Goodlatte, on brief), for appellees.


The appellee, Wise County, valued certain natural gas assets in the County owned by the

appellants for purposes of real estate taxation.  The County assessed the appellants' property under

Code § 58.1-3286, valuing the physical structures built to tap into the natural gas but not the gas

reserves themselves.  The County used just one valuation approach to determining the property's

value, which resulted in a higher valuation than the appellants' preferred approach.  The

appellants sought to correct the assessment in the trial court.

The trial court upheld the County's assessment.  It concluded that the County correctly

excluded the reserves from the assessments.  It also held that the County's assessments were

entitled to the statutory presumption of correctness, which the appellants failed to rebut.  The

appellants argue that the County violated Code § 58.1-3286 by excluding the reserves, causing a

cascade of errors that resulted in excessively high assessments.  We disagree and affirm.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

In 2018, EQT Production Company and EQT Gathering, LLC (collectively "EQT") sold its property to Diversified Production LLC ("DGO") in a bidding process ("2018 Sale"). The 2018 Sale property consisted of land and natural gas assets in 49 counties and three states and comprised part of the Huron Play, a 2.5-million-acre space of land where EQT has many natural gas assets.

Of the 2018 Sale property, 578 gas wells, 187.7 miles of pipes, and 14 compressors were located in Wise County ("Contested Real Estate"). The sale price for the 2018 Sale covered all the property sold and did not state an amount for the Contested Real Estate specifically. Additionally, EQT sold the Contested Real Estate after announcing that it would "no longer be developing the Huron Play gas field" and "voluntarily t[aking] large impairments to the assets in the amount of $2.3 billion and $118.1 million." *EQT Prod. Co. v. Wise Cnty.*, 112 Va. Cir. 415, 416 (Wise December 15, 2023). "An impairment is an accounting term for when the market value of an asset is determined to be lower than the book value." *Id.*

In 2018, 2019, and 2020 ("Tax Years"), EQT and DGO (collectively "Taxpayers") drew and transported natural gas from the Contested Real Estate. During the Tax Years, Wise County assessed taxes on the Contested Real Estate according to Code § 58.1-3286 ("Mineral Statute"), the statute at issue in this case. Taxpayers unsuccessfully sought to correct the assessment under Code § 58.1-3984 in the trial court.

A. Natural Gas Assets and Valuation Approaches

A natural gas asset has three distinct components: the gas well; the gas reserves, which is the underground natural gas accessed by the well; and gathering assets, which are pipelines and compressors used to transport the natural gas out of the well. The gas well and the gathering

assets are collectively termed the "well infrastructure" because they do not generate income on their own like reserves do or "have any stand-alone value independent of the [gas] reserves."

There are three approaches to computing the fair market value of a natural gas asset. The trial court explained these approaches:

> In Virginia, mineral land must be taxed at its [fair market value]. There are three primary ways of determining [fair market value]: the cost approach, income approach, and market approach. The cost approach values property at replacement cost new less depreciation, or reduced value from deterioration or obsolescence. The income approach bases [fair market value] on the present worth of monetary benefits anticipated to be derived from future ownership of the property. The market approach [or sales approach] uses analysis and comparison of recent sales of comparable property.

*EQT*, 112 Va. Cir. at 416; *accord McKee Foods Corp. v. Cnty. of Augusta*, 297 Va. 482, 496 (2019).

"Each of these approaches utilizes different characteristics of a property to estimate fair market value, and each analyzes different elements of the property which would likely affect the price a potential buyer would be willing to pay for the property on the open market." *Keswick Club, L.P. v. Cnty. of Albemarle*, 273 Va. 128, 137 (2007).

The County used the cost approach to determine the fair market value of the Contested Real Estate during the Tax Years. Taxpayers argue that the County should have used the income approach. They assert that, because the well infrastructure has no value apart from the reserves, and vice versa, a natural gas asset's value is "universally determined by actual market participants [using the income approach]."

Using the cost approach, the County determined the Contested Real Estate's value to be $134.3 million in 2018, $134.3 million in 2019, and $104.6 million in 2020. Under the income approach, the Contested Real Estate's value would have been $33 million in 2018, $22 million in

- 3 -

2019, and $27 million in 2020. Thus, the cost approach resulted in valuations that were "about 4.5 times" greater than the value computed by the income approach.

B. Proceedings

Prior to this case, Taxpayers challenged another tax assessment of their property by the County in 2011 ("2011 Decision"). In that case, both parties agreed that the cost approach was the appropriate way to determine the property's value.

In the present case, the trial court heard testimony and reviewed documentary exhibits. Based on the evidence, it upheld the County's cost-based assessment of the Contested Real Estate.

Steve Sprenger, a tax and auditing expert called by Taxpayers, valued the 2018 Sale property at $363 million. He reached this value by applying the income approach, anticipating "future cash flows" likely to be derived from selling the natural gas produced by the assets. Sprenger's valuation was $100 million more than the price that DGO actually paid for the 2018 Sale. Sprenger also separately valued the Contested Real Estate (the property specific to Wise County), again using the income approach.

Douglas Mullins, Wise County Commissioner of Revenue, testified regarding how the County reached its assessment value for the Contested Real Estate. He believed that the 2011 Decision established the cost approach as the "fundamental" way of assessing the value of gas properties. Unlike Sprenger, he "did not formally research income data" because he only considered the Contested Real Estate's well infrastructure (the wells, pipelines, and compressors), not the income-generating gas reserves. *EQT*, 112 Va. Cir. at 417. Additionally, he "disregarded" the 2018 Sale price as not indicative of the property's value because "the sale price was significantly below sale value." *Id.* Since the well infrastructure did not generate income and the 2018 Sale was too low to reflect market value, Mullins did not use the income or market approaches. Instead, he used the cost approach sanctioned by the 2011 Decision.

Wise County's expert was Paul Hornsby. He "independently chose" to use the cost approach in making his valuation because the Contested Real Estate was limited to well infrastructure. *Id.* The income and market approaches were unworkable since there was no income or sales data "specific to well infrastructure, because [such] data typically includes the well infrastructure *and* the reserves." *Id.* at 417-18 (emphasis added). He opined that it is "unreliable" to "parse" income or sales data pertaining to the entire gas asset into separate data for the well infrastructure alone. Accordingly, he concluded that the cost approach was "the best method" for assessing the Contested Real Estate's value. *Id.* at 418. Hornsby's cost-based valuations were higher than Taxpayers' and the County's valuations. *Id.* at 417.

Following evidence and arguments, the trial court held for the County and did not disturb the County's assessment. *Id.* at 425. Taxpayers appeal.

Taxpayers present three assignments of error. In the first, they argue that the trial court erred in ruling that the Mineral Statute did not require the County to assess the reserves as part of land "improved and under development." In the second, they assert that the trial court erred in ruling that the County's assessments were entitled to a presumption of correctness and that the presumption was not rebutted. In the third, they argue that the trial court erred in requiring proof of "manifest error" to rebut the presumption of correctness rather than proof by a preponderance of the evidence. We address these arguments below.

ANALYSIS

The dispositive issue of the case is whether Code § 58.1-3286, the Mineral Statute, required the County to assess the gas reserves as part of land improved and under development. Taxpayers argue that the Mineral Statute mandated the County to assess the reserves and that the County's failure to do so resulted in "cascading errors" which led to an excessive valuation of the Contested Real Estate. But the County argues that the Mineral Statute forbade it from

assessing the reserves. We turn to this statutory question, which "presents a question of law that [an] [appellate court] reviews de novo." *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) (citing *Brown v. Commonwealth*, 284 Va. 538, 542 (2012)).

A. Whether the Mineral Statute Required Assessment of Reserves

The County taxed the Contested Real Estate under the Mineral Statute. The Mineral Statute requires a county to "specially and separately assess at the fair market value all mineral lands and the improvements thereon." Code § 58.1-3286. "[I]n assessing mineral lands," a county must value three parts of it:

> 1. The area and the fair market value of such portion of each tract as is improved and under development [hereinafter, "subdivision 1"];
>
> 2. The fair market value of the improvements upon each tract ["subdivision 2"]; and
>
> 3. The area and fair market value of such portion of each tract not under development ["subdivision 3"].

*Id.*

The three subdivisions are separated by the conjunctive "and." A county must value each subdivision, unless excused by another provision.

The excusing provision in the Mineral Statute comes in its fourth paragraph. The fourth paragraph ("Paragraph Four") provides that, "[i]n the alternative" to assessing subdivision 1, a county "may impose by ordinance a severance tax on . . . gases extracted from the land lying within its jurisdiction." *Id.* Paragraph Four's severance tax is capped at one percent of the gross receipts from the extracted gases. The Mineral Statute thus excuses a county from assessing subdivision 1 if it imposes Paragraph Four's tax instead.

The second statute relevant to the case is Code § 58.1-3712 ("3712"). The statute is titled, "Counties and cities authorized to levy severance tax on gases." It allows a county to

"levy a license tax" on anyone "in the business of severing gases from the earth."  Code § 58.1-3712(A).  Like the Mineral Statute's Paragraph Four, 3712 caps the tax at one percent of gross receipts.

Additionally, 3712 refers to the Mineral Statute.  3712 states that, "if the tax provided herein is levied, such county . . . cannot enact the provisions of § 58.1-3286 relating to a tax on gross receipts."  Code § 58.1-3712(A).  In other words, a county imposing a 3712 tax is disallowed from also imposing a tax under Paragraph Four.

The parties agree on three important facts concerning these two statutes.  First, the County imposed a 3712 severance tax on Taxpayers during the Tax Years.  Second, subdivision 1 of the Mineral Statute—requiring assessment of land improved and under development—may reasonably include gas reserves.  If the County was required to assess subdivision 1, it was therefore also required to assess the reserves.  And third, the only subdivision that the County did in fact assess was subdivision 2, covering improvements, meaning the well infrastructure.  It did not assess subdivision 1 or the gas reserves within it.[1]  All agree that the County valued the well infrastructure but not gas reserves.  This omission is justified only if the County was excused from assessing subdivision 1.

What the parties do not agree on concerning the statutes is 3712's impact on the Mineral Statute's operation.  Taxpayers argue that the two statutes' taxes are distinct from each other.  They assert that the County had to assess subdivision 1 unless it imposed a tax *pursuant to the Mineral Statute*, rather than a different law like 3712.  Since they were only taxed under 3712, Taxpayers argue that Paragraph Four of the Mineral Statute is inoperative, and the County therefore had to assess subdivision 1 and the reserves.

---

[1] Both parties agree that subdivision 3 (land "not under development") is not at issue.

The County disagrees. It argues that it could not assess the reserves because it "already imposed[d] a severance tax upon those same natural resources pursuant to . . . [3712]." The County asserts that a 3712 tax brings Paragraph Four into operation because the two statutes' severance taxes are "functionally identical." In its view, a 3712 tax *is* a Paragraph Four tax. It follows that a county that applies a 3712 tax may not assess subdivision 1, as otherwise it could double tax the same minerals. The County asserts that reading the two statutes together makes clear that the legislature did not intend to allow double taxing of the same minerals. It believes it had the following choice: to apply a severance tax on the reserves either under 3712 or Paragraph Four, or else to assess subdivision 1. Having taxed the Contested Real Estate's reserves under 3712, the County had to exclude subdivision 1 from its assessment.

It may appear confusing that Taxpayers wish for more of their property to be valued than what the County assessed. But they want the County's assessment to include subdivision 1 in addition to subdivision 2 because adding the reserves into the assessed property would undermine the appropriateness of the cost approach. And the appropriateness of the cost approach in this case is what caused Taxpayers to owe more taxes than they would have owed under the income approach, their preferred valuation approach.

This statutory question narrows to whether the statutes' taxes are substitutes or equivalents. If they are substitutes, a 3712 tax prevented the activation of Paragraph Four of the Mineral Statute and *required* the assessment of subdivision 1. If they are instead equivalents, a 3712 tax automatically activated Paragraph Four and *excluded* subdivision 1 from assessment.

We hold that a 3712 severance tax is equivalent to Paragraph Four's tax such that a 3712 tax triggers Paragraph Four. Consequently, a 3712 tax prevents a county from assessing subdivision 1 or the gas reserves that fall under that subdivision. By applying a 3712 tax on the

reserves extracted from the Contested Real Estate during the Tax Years, the County disallowed itself from assessing subdivision 1 and so could not assess the reserves.

The terms of the statutes support the view that their respective taxes are equivalent. Paragraph Four authorizes "any county or city" to impose a tax on gas "extracted from the land" in its jurisdiction. Code § 58.1-3286. Similarly, 3712 authorizes "any county or city" to impose a tax on gas "sever[ed] . . . from the earth." Code § 58.1-3712(A). Both statutes limit the tax to one percent of gross receipts. 3712 even identifies Paragraph Four by using the "gross receipts" language: "[I]f the tax provided herein is levied, such county or city cannot enact the provisions of [the Mineral Statute] *relating to a tax on gross receipts*." Code § 58.1-3712(A) (emphasis added). This choice of words by 3712's drafters shows that the legislature viewed the "gross receipts" language as describing a single tax on extracted gases that a county may apply pursuant to multiple statutes.

Moreover, 3712's reference to Paragraph Four lends not just wording but substantive support to the argument that the legislature conceived the two statutes' taxes as the same. 3712 prohibits a county from applying a severance tax under Paragraph Four if it already imposes one under 3712. We presume this prohibition works in both directions: it also prohibits a county from imposing a 3712 severance tax if it already imposes one under Paragraph Four. Paragraph Four does not state that a tax under its terms prohibits a county from taxing under 3712. The lack of a reciprocal prohibition in Paragraph Four could be considered significant if viewed in isolation. But it would strain the statutes' plain meanings even more to suggest that a county could impose *two* taxes if it applied a Paragraph Four tax first and a 3712 tax second but could only impose *one* tax if it applied a 3712 tax first and a Paragraph Four tax second. It would be illogical for the order in which the taxes are applied to defeat the legislature's clear intent that the two taxes not be imposed simultaneously on the same resource. Thus, we construe 3712's

- 9 -

reference to Paragraph Four to prohibit a county from applying both taxes on one taxpayer, regardless of which tax is applied first. Given that a county cannot impose both a 3712 tax and a Paragraph Four tax, the statutes' severance taxes appear to be equivalent.

We conclude that the 3712 tax, equivalent to the Paragraph Four tax, prohibited the County from assessing subdivision 1. Paragraph Four allows a tax on the sale of gas extracted from the land to stand in place of assessing subdivision 1, lands "improved and under development." Code § 58.1-3286. But the legislature did not provide an alternative to subdivision 2, the physical improvements on the land such as well infrastructure, nor an alternative to subdivision 3, the land not improved. Thus, a county must always assess physical improvements and unimproved land but may choose between taxing the gas directly or assessing the value of land that has been improved and developed due to the gas being extracted from it.

The four corners of the Mineral Statute reveal a legislative determination that *either* the reserves be taxed directly, *or* the land be taxed as it is improved by the presence of reserves under it. But not both. It follows that 3712's tax on gases "severed" from the earth also must abide by this legislative determination. The County taxed the reserves extracted from the Contested Real Estate under 3712 and so could not also assess the value of the land improved by such reserves. In short, the 3712 tax prohibited the County from assessing the reserves.

Taxpayers argue that the trial court erroneously ruled that the Mineral Statute's three subdivisions were disjunctive elements instead of conjunctive elements. But we do not address this argument due to the right result for the wrong reason doctrine. "Under the right result for the wrong reason doctrine, 'it is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons.'" *Miller & Rhoads Bldg., LLC v. City of Richmond*,

292 Va. 537, 542 (2016) (alterations in original) (quoting *Perry v. Commonwealth*, 280 Va. 572, 579 (2010)).

We have settled the question of whether the trial court was correct in not assessing subdivision 1. It was. And Taxpayers waived any challenge to whether the County erred in not assessing subdivision 3. In consequence, even if the trial court's analysis incorrectly assumed that the Mineral Statute's elements were disjunctive rather than conjunctive, the outcome would not change. Accordingly, we affirm the trial court's ruling that the County did not have to assess the lands improved or the reserves of the Contested Real Estate under the Mineral Statute.

B. Whether the Presumption of Correctness Applied or was Rebutted

In Taxpayers' second assignment of error, they argue that the County's assessments were not entitled to a presumption of correctness. They argue in the alternative that, if the assessments were entitled to the presumption, Taxpayers rebutted it.

Code § 58.1-3984(B) creates, where applicable, a presumption that a county's real estate tax assessment is correct. Whether the presumption applies depends on a county's proper consideration of the three approaches to valuing property.

There are three valuation approaches for determining a property's fair market value. *McKee*, 297 Va. at 496 (citing *Keswick*, 273 Va. at 137). As set forth earlier, the cost approach estimates the property's current cost minus value lost from deterioration or obsolescence (i.e. replacement cost minus depreciation). The income approach considers the present value of future anticipated income streams. And the market or sales approach looks at recent sales of comparable property. *Id.* (quoting *W. Refin. Yorktown, Inc. v. Cnty. of York*, 292 Va. 804, 813 (2016)).

In determining a property's value, a county should consider all three valuation approaches "to maximize the likelihood that the valuation accurately reflects the property's fair

market value." *Id.* (quoting *Keswick*, 273 Va. at 137). If a county uses just one approach, the presumption of correctness applies only if it "considered and properly rejected" the other approaches. *Id.* at 496-97. A county using just one approach is entitled to the presumption if it "ma[d]e an 'effort to acquire the data necessary to perform appraisals' based on the other approaches." *See Keswick*, 273 Va. at 137 (quoting *Bd. of Supervisors v. HCA Health Servs. of Va., Inc.*, 260 Va. 317, 330 (2000)).

Where the presumption applies, a taxpayer may rebut it by proving both of two elements. To rebut, a taxpayer must prove by a preponderance of the evidence that (1) the property in issue was valued at more than its fair market value and (2) the assessment was "not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations such as the International Association of Assessing Officers ["IAAO"] and applicable Virginia law relating to valuation of property." Code § 58.1-3984(B); *Portsmouth 2175 Elmhurst, LLC v. City of Portsmouth*, 298 Va. 310, 320-21 (2020).

Whether the presumption of correctness applies is a question of statutory interpretation that we review de novo. *See McKee*, 297 Va. at 495 (citing *Commonwealth v. Amos*, 287 Va. 301, 306 (2014)). But we apply a deferential standard of review to the trial court's determination that a taxpayer did not meet their burden of proof on a rebuttal element. *See Portsmouth*, 298 Va. at 328, 332-33 ("Applying the standard of review, as we must, the circuit court did not err in concluding that the Taxpayer failed to establish by a preponderance of the evidence that" the second rebuttal element was met.). We also defer to the trial court's "weigh[ing] [of] conflicting testimony from experts concerning . . . fair market value." *Id.* at 333. "Minor differences of opinion concerning fair market value" are not enough to rebut the presumption because property value "'is a matter of opinion [for which] there must necessarily be left a wide room for the

exercise of opinion.'" *Id.* at 324 (quoting *City of Norfolk v. Snyder*, 161 Va. 288, 292 (1933)). In reviewing a county's assessment, "courts will [not] be converted into assessing boards." *Id.* (quoting *Norfolk*, 161 Va. at 292).

### I. Whether the Presumption of Correctness Applies

Taxpayers argue that the County's assessment is not entitled to the presumption at all because the County used the cost approach without considering and properly rejecting the other approaches. First, they assert that the income approach was appropriate because the well infrastructure and reserves produce income when paired, even if improvements alone do not. Second, Taxpayers contend that the market approach was also appropriate but that the County erroneously "gave no weight" to the 2018 Sale. *See EQT*, 112 Va. Cir. at 421.

The trial court ruled that the County properly rejected the income approach because the Contested Real Estate does not produce any income. It also upheld the County's rejection of the market approach as "impracticable" and not "demonstrative of property value." *Id.* at 423.

We agree that the County considered and properly rejected both approaches.

First, the income approach was considered and properly rejected. As discussed above, the County correctly limited its assessment to well infrastructure without considering the reserves. The 3712 tax barred the County from assessing the reserves, rendering the income approach inapposite because well infrastructure does not create any income. Thus, the County was justified in "not request[ing] income data when deciding to use the cost approach," as it would be "nonsensical" to seek out income data where none exists. *See id.* at 420-21.

Second, the market approach was considered and properly rejected. "It is well settled that a recent sale of the subject property, while not conclusive in determining fair market value, is entitled to 'substantial weight.'" *Portsmouth*, 298 Va. at 325 (quoting *Keswick*, 273 Va. at 139). But "a taxing authority may choose not to consider a sale of the subject property that is not

an arms-length transaction made on the open market." *Keswick*, 273 Va. at 140 (citing

*Tidewater Psychiatric Inst. v. City of Virginia Beach*, 256 Va. 136, 140-41 (1998)). A county is

more likely to have properly rejected the market approach if it "attempt[ed] to acquire

information relevant to [a recent sale]" and "investigate[d] the terms of that sale." *See id.*

In deciding whether the County considered and properly rejected the market approach,

we recognize that the "assessment of real estate . . . is a process upon which even experts can

disagree." *Id.* at 138. Thus, "we do not review the [experts'] ultimate conclusions . . . regarding

the utility or non-utility of applying a certain approach." *Id.* Instead, we ask whether the County

"sufficiently attempt[ed] to gather the data necessary to utilize the [market] approach" so as not

to apply the cost approach "in an automatic fashion." *See id.* at 139.

Here, the evidence shows that the County gathered enough data to properly reject the

market approach in assessing the Contested Real Estate's value. The County "research[ed] and

monitor[ed] sales of real estate" in Wise County and was aware of the 2018 Sale. *EQT*, 112

Va. Cir. at 421. But it "chose to disregard the significance of the [2018] [S]ale based on its

belief that the [S]ale was not representative of [fair market value]." *Id.* The County cited three

pieces of evidence in support of its view. One, EQT "voluntarily took large impairments" of the

Contested Real Estate, which caused the property's market value "to be lower than the book

value." *Id.* at 416, 421. Two, before the sale, EQT publicly announced that it had reclassified

the Contested Real Estate as "non-core, meaning that EQT would no longer be developing" those

gas fields. *Id.* at 416, 421. And three and most critically, the 2018 Sale price was over $100

million less than the value that Sprenger estimated for the total property, a "vast disparity." *Id.* at

- 14 -

416-17, 421.[2]  We thus find enough evidence that the County sought out the data necessary to reject the market approach.

Since the income and market approaches were considered and properly rejected, the presumption of correctness applies to the assessments.

*II.  Whether the Presumption of Correctness was Rebutted*

Taxpayers argue that they rebutted the presumption by proving both rebuttal elements. The County responds that the trial court correctly found that the presumption was not rebutted.

To rebut the presumption of correctness, a taxpayer must prove two elements by a preponderance of the evidence.  *McKee*, 297 Va. at 499.  Code § 58.1-3984(B) requires a taxpayer to prove that a property assessment was more than fair market value and was not reached in accordance with generally accepted appraisal practices.  *Id.*  We ask only whether the trial court's findings on the elements were clearly erroneous.  *See Portsmouth*, 298 Va. at 328 ("The question before us is whether the Taxpayer's evidence established by a preponderance of the evidence that [it met the second element]. . . .  Under the standard of review, we conclude that the Taxpayer's evidence does not *compel* this conclusion." (emphasis added)).

We do not reach the first element because we find no error in the trial court's ruling that Taxpayers did not prove the second element.

Taxpayers argue that the County's failure to consider the other valuation approaches was "a violation of generally accepted appraisal standards."  They assert that the IAAO supports their position that the income approach is more appropriate than the cost approach for valuing the

---

[2] We do not review whether the County's ultimate conclusion that the 2018 Sale was "unreliable" is correct.  *EQT*, 112 Va. Cir. at 423.  The County acquired the relevant information about the terms of the 2018 Sale, which ends our inquiry.  *See Keswick*, 273 Va. at 140 (finding that a county did not consider and properly reject the market approach where "the evidence does not reflect that the county made *any* attempt to acquire information relevant to . . . [whether] the sale was . . . an arms-length transaction" (emphasis added)).

Contested Real Estate. In particular, they argue that it was error to credit Hornsby's testimony that the IAAO classifies the Contested Real Estate as "special purpose," where the cost approach is preferred, instead of "industrial," where the income approach is preferred.

We disagree. The trial court wrote that, "while both the IAAO and the case law show a preference for . . . using two or more valuation approaches, it is not a mandatory requirement that Wise County do so provided it considered and properly rejected other approaches." *EQT*, 112 Va. Cir. at 424. As discussed above, we found that the County did in fact consider and properly reject the other approaches.

Moreover, Hornsby's testimony that the IAAO classifies the Contested Real Estate as special purpose is not clearly erroneous. The IAAO's Standard on Mass Appraisal of Real Property, presented as an exhibit, states that the cost approach is "most appropriate" for special-purpose properties because of "the general absence of adequate sales or income data." It also states that the income approach is "most appropriate" for industrial property "if sufficient income [is] available." But no income data was available at trial because the County correctly concluded that it could not assess the reserves and that the well infrastructure consequently lacked any income data. Given the lack of income data, we find that the evidence does not compel the conclusion that the Contested Real Estate was industrial rather than special purpose.

Accordingly, we uphold the trial court's determination that the assessments were in accordance with generally accepted appraisal practices. Taxpayers did not prove the second element required to rebut the presumption of correctness. Therefore, the trial court correctly ruled that they did not rebut the presumption.

### III. Whether the Trial Court Required Proof of Manifest Error

Taxpayers' final argument is that the trial court erred in requiring proof of "manifest error" to rebut the presumption of correctness, rather than proof by preponderance of the evidence. This argument fails on its face.

Taxpayers' brief incorrectly asserts that the "trial court held that [they] had failed to show 'manifest error' in the assessments, and thus that they had failed to rebut the presumption of correctness." This misstates the court's ruling. It wrote, "Because Taxpayers failed to rebut the presumption . . . [they] need to show that Wise County committed manifest error in its assessment." *EQT*, 112 Va. Cir. at 423. Thus, the trial court did not require manifest error to prove rebuttal, as Taxpayers contend, but only to overturn the assessment if rebuttal was not proven. The court correctly noted the proper rebuttal elements and standard of proof in its opinion. *Id.* at 419-20. We thus find this argument to be without merit.

### CONCLUSION

The trial court upheld the County's cost-based assessment of the Contested Real Estate. It correctly found that the Mineral Statute required that the County only assess the well infrastructure, which does not generate income. It also correctly held that the statutory presumption of correctness applied and was not rebutted by Taxpayers. We affirm.

*Affirmed.*